James Andrew THOMAS,
Plaintiff–Appellee,

v.

Dick CHENEY, Secretary of Defense, and Michael P.W. Stone, Secretary of the Army, Defendants–Appellants.

No. 90–1135.

United States Court of Appeals, Federal Circuit.

Feb. 12, 1991.

James A. Thomas, Guidepost, Inc., Phoenix, Ariz., argued, pro se.

E. Roy Hawkens, Dept. of Justice, Washington, D.C., argued, for defendants-appellants. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., Tony M. Graham, U.S. Atty. and Anthony J. Steinmeyer. Also on the brief were Lt. Col. Mark A. Steinbeck, and Maj. Robert C. McFetridge, Office of the Judge Advocate General, Dept. of the Army.

Before NEWMAN and MICHEL, Circuit Judges, and CONTI, Senior District Judge.*

* The Honorable Samuel Conti, Senior District Judge, United States District Court for the

MICHEL, Circuit Judge.

Defendants, the Secretaries of Defense and the Army (collectively "the Army"), appeal the judgment of the United States District Court for the Northern District of Oklahoma, reversing the decision of the United States Army Board for Correction of Military Records ("Board"), *In the Case of James A. Thomas*, AC85–07092 (Nov. 26, 1986), and ordering expunged from Thomas' military personnel records all "administrative AWOL" and certain other derogatory references. *James Andrew Thomas v. Weinberger*, No. 87–C–378–E (N.D.Okla. Oct. 12, 1989). Defendants also appeal the district court award to Thomas of pay arising from constructive service credit for the period between July 22, 1982, and April 10, 1983, with concomitant full restoration of benefits, based on its conclusion he was wrongfully classified "administrative[ly] AWOL."

Although the district court correctly ordered certain derogatory references deleted from Major Thomas' records, Thomas was lawfully denied benefits and service credits by the Board because he was properly deemed administratively AWOL, and hence ineligible for pay and benefits even though he was not convicted of the criminal offense of AWOL. Accordingly, we *affirm-in-part* and *reverse-in-part* the judgment of the district court in this suit under the "Little" Tucker Act.

## BACKGROUND

Thomas' military service dates to 1950, when he enlisted and served with the Army National Guard of the United States. By 1981, Thomas had achieved the rank of Major, United States Army Reserve. In April 1981, Thomas left inactive reserve status to participate in the Active Guard/Reserve ("AGR") "two-plus-two" program, which consists of a two-year tour of duty with a possible, mutually agreed on, two-year extension. Major Thomas was assigned to an initial tour, to conclude on April 10, 1983, teaching Military Science to Reserve Officer Training Corps ("ROTC") cadets at Southwest Missouri State University ("Southwest") in Springfield, Missouri. The assignment was made under the Army Reserve Long Tour Management Program, which allows officers to perform their entire tour at the original assignment location and prohibits subsequent involuntary reassignment to duty stations greater than fifty miles from the initial post.

During Thomas' tenure at Southwest, apparently personal friction arose between Thomas and his commanding officer. As a result, the commanding officer, Lieutenant Colonel Curbow, offered Major Thomas a choice: either be relieved of his duties, or request reassignment. Thomas chose the latter, and in February 1982 formally requested reassignment. On May 13, Thomas was ordered to report to Fort Knox, Kentucky, by June 1. The Fort Knox orders were revoked by new orders issued on June 8. These orders also stated that Thomas' Southwest assignment remained in effect. From June 7 to July 21, Thomas was assigned to, and participated in, ROTC Advanced Camp at Fort Riley, Kansas. Meanwhile, on June 28, Thomas declined new reassignment orders to either Fort Bragg, North Carolina, or Fort Eustis, Virginia, because both facilities were located outside the Long Tour program's fifty-mile involuntary reassignment limit. Sometime after the conclusion of the ROTC summer camp, Thomas went home to Tulsa, Oklahoma, rather than remain at Southwest pursuant to the June 8 orders—the last orders complying with the AGR program limitations.

On August 3, Thomas was again ordered to Fort Bragg, this time by August 16. Again relying on the Long Tour program's reassignment restrictions, Thomas, by mailgram from his Tulsa home, once more declined the assignment. On August 4, Thomas wrote Colonel David M. Fleming, II, Chief of the Long Tour Management Office, inquiring about his status and seeking clarification concerning contradictory instructions he believed he received in telephone conversations with Army personnel.

Northern District of California, sitting by designation.

In his letter to Colonel Fleming, Major Thomas wrote:

> Be advised, Sir, I am not requesting early release from active duty. *Nor have I ever requested leave.* I'm just waiting.
>
> So many contradictory stories have been told [to] me over the phone that I prefer that future communication be strictly formal, strictly written, strictly hardball.

(emphasis added).

■ On August 17, the day after Thomas was to report to Fort Bragg, Colonel Lawrence W. Ondecker, from Fort Knox, met with Thomas at Ondecker's motel room in Springfield, Missouri. Ondecker and Thomas discussed Thomas' non-compliance with the Fort Bragg orders. Ondecker wrote on September 3 to Brigadier General Smith that "the JAG's opinion was that [the Army's] only recourse is to terminate Major Thomas' AGR status" and that he orally had advised Thomas that Thomas should comply with the Fort Bragg orders and that Thomas was currently absent without leave ("AWOL").[1]

After his interview with Colonel Ondecker, Major Thomas returned again to Tulsa and awaited valid reassignment orders. Thomas continued to receive military pay while in Tulsa from July 1982 through June 1983. During this period, Major Thomas did not report in person to any military facility, nor did he perform any military duties.

Meanwhile, on October 25, 1982, Fort Bragg issued "Dropped from the Rolls of the Army" ("DFRA") orders effective September 15, 1982. A year later, on October 28, 1983, the Military Personnel Center revoked the DFRA action. On April 20, 1984, the Army retroactively reassigned Thomas from the U.S. Army Reserve Control Group to Fort Bragg, effective September 15, 1982, and notified him that he was AWOL and dropped from the rolls of the Army as of October 15, 1982. On April 25, 1984, he was designated a deserter.

Major Thomas later petitioned the Board for correction of his military records, specifically requesting that all references to "administrative AWOL," "DFRA" and "desertion" be deleted from his records. The Board ruled that because the reassignment locations were outside the Long Tour program's authorized "commuting distance," the reassignment orders had "no legal validity." Therefore, the Board reasoned, all actions placing Thomas in DFRA and deserter status were a "nullity." It did not, however, require the Army to remove these references from the records. Nor did the Board upset the Army's ruling that Thomas was "administratively considered AWOL" after July 22, 1982, stating that "there is no evidence that he timely attempted to resolve his status in the 22 July 1982 through 10 April 1983 period of time."

On appeal of the Board's decision to the District Court for the Northern District of

---

1. Although the record indicates that Ondecker and Thomas discussed, *inter alia,* his "relief from Southwest," we have found insufficient evidence to support the district court's finding that Ondecker orally relieved Thomas from reporting in any fashion to Southwest. Accordingly, as discussed below, that finding is overturned as clearly erroneous. A more plausible reading of the record indicates that Ondecker and Thomas discussed Thomas' being relieved of any duty to report to Southwest only in the context of reassignment. As the Board found, "[t]here is no evidence available to indicate that anyone told [Thomas] to return to his home and wait for a resolution of his case."

Even in the face of the Army's continued position that he was not relieved from Southwest, Thomas failed to make any assertions, either in his briefs or at oral argument here, to the contrary. Indeed, Major Thomas explained to the district court that he returned home completely on his own initiative. As Thomas stated in his district court complaint, he believed he was under no "legal obligation to search for" an Army official to validate his decision to return home, and, the decision to leave Southwest for Tulsa, was, he admitted, an act of "personal initiative." Jt.App. at 20.

In any event, only written orders, not *oral* promises, can supersede previously issued written orders. Major Thomas recognized this. In his August 4 letter to Colonel Fleming, written almost two weeks *before* his interview with Ondecker, Thomas demanded that all "future communication be strictly formal, strictly written, strictly hardball." Thus, Thomas' assertion, quoted by the dissent, that Colonel Ondecker relieved him on behalf of the Secretary of the Army, even if credited, cannot be correct.

Oklahoma, the court, adopting, essentially unchanged, a magistrate's report, found that since Major Thomas had no assigned place of duty after July 22, 1982—both because he had validly declined reassignment to Fort Bragg and because he had been relieved of duty at Southwest—he could not have been AWOL and that the Board's holding to the contrary was arbitrary and without basis in law and not supported by substantial evidence. The court similarly reversed the Board's refusal to order removal of the references to "deserter" and "DFRA" despite the Board's holding that these designations were based on actions that were a "nullity."

## JURISDICTION

The district court's jurisdiction to review the actions of the Board was based on 28 U.S.C. § 1346(a)(2) (1988) (the "Little" Tucker Act), and we have jurisdiction over this appeal as provided by 28 U.S.C. § 1295(a)(2) (1988) (exclusive review of "Little" Tucker Act actions).

## QUESTIONS PRESENTED

(1) Whether 37 U.S.C. § 503(a) (1988) as implemented by Army Regulation 630–10 authorizes the Army to make "administrative AWOL" determinations that disqualify service members from receiving pay and benefits; and

(2) If so, whether Major Thomas was "administratively AWOL" from July 22, 1982 until April 10, 1983, and therefore not entitled to military pay or retirement credits for that period because his absence was neither authorized nor excused but was avoidable.

## DISCUSSION

### I

 A service member "absent without leave . . . forfeits all pay and allowances

for the period of that absence, unless it is excused as unavoidable." 37 U.S.C. § 503(a) (1988). On its face, and in context, section 503(a) clearly authorizes, indeed requires, the military departments to withhold salary and derivative benefits for any service member on avoidable and unauthorized leave. *Werner v. United States*, 642 F.2d 404, 412, 226 Ct.Cl. 462 (1981). Among those derivative benefits are service credits or "points"—a primary issue of this appeal.[2]

 Implementation of section 503(a) in cases where the Army elects not to criminally prosecute an AWOL member, counsel for the Army argues, is governed by Army Regulation ("AR") 630–10, which instructs Army personnel on how to document and process persons appearing to be absent, without authorization, or to have deserted. According to the Army and the regulation itself, AR 630–10 "provides guidance," *inter alia*, "for determining absent without leave (AWOL) or desertion status. . . . It also describes administrative actions for members returning to military control." AR 630–10 ¶ 1–1 (Jan. 15, 1980).

The district court, however, ruled that AR 630–10 does not authorize the Army to classify Major Thomas, or any service member on unauthorized leave, as "administrative[ly] AWOL." *Thomas v. Weinberger*, No. 87–C–378–E, slip op. at 3 (May 17, 1989). According to the court, "The Regulation does not . . . define the term 'administrative AWOL,' and [the court] here concludes, upon review of AR 630–10, that no classification, as such, exists." *Id.*

While the court correctly observes that nowhere in AR 630–10 is the phrase "administrative AWOL" explicitly defined, that does not preclude the existence of such a status. The district court's cramped

---

**2.** The dissent correctly notes this appeal encompasses many issues and forms of relief. However, the dissent wrongly assumes that service credits accrued during the nine-month period in question are not primary issues. Both the Board and the district court devoted considerable attention to these issues, and, contrary to the dissent's assertion, the Army, as appellant, has framed *its* appeal as whether it may make administrative determinations that a service member was absent without leave and "therefore not entitled to pay or benefits for that . . . period." As the Army argues, it is appealing a decision invalidating the use of a regulation designed to "protect the public treasury."

reading would render both the statute and the regulation toothless in situations where the Army, in its discretion, chooses not to prosecute criminally a service member on unauthorized leave, but instead opts only to not pay or otherwise reward the absentee. Contrary to what the court assumed, AR 630–10 did not need explicitly to define "administrative AWOL" because it is merely a term of convenience for a "no pay" status mandated by section 503(a), not a criminal "offense."[3] As members of the military well understand, it is a status determined in the routine administration of military affairs without need of the delay, expense, and unnecessary harshness of criminal prosecution. The regulation as written and as applied to Major Thomas recognized this distinction.

Simply because the statute and implementing regulation do not instruct the Army record keeper as to the specific nomenclature for non-criminal AWOL does not mean that a reasonable method of classification and description of this status for entry on the service member's record is therefore precluded. *Wilson v. United States*, 917 F.2d 529, 535–36 (Fed.Cir.1990) (in banc) (court will defer to Army's consistent reasonable interpretation of statute); *Chevron USA Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) (when a statute is silent or ambiguous with respect to a specific issue, the administering agency's interpretation, if reasonable, is to be followed by the court).

■ On careful reading of AR 630–10, it is clear that the regulation, reflecting section 503(a), was designed to instruct Army staff on administrative procedures for determining both criminal *and* non-criminal AWOL status. For example, paragraph 1–7 notes that the unit commander[4] "will decide whether disciplinary [or criminal] action should be started *and/or* whether the member should be charged with time lost (emphasis added)." Indeed, the distinction between the administrative and disciplinary aspects of AWOL is recognized in AR 630–10 ¶ 1–8.c., which provides that a soldier may be charged with time lost during the absence, regardless of a court-martial acquittal for the offense of AWOL, because "[t]he acquittal or disapproved conviction affects only the disciplinary aspects of the absence." Here, the appropriate authorities decided against disciplinary or criminal action in a court-martial proceeding and instead chose only to charge Major Thomas with time lost.

■ To read AR 630–10 otherwise would create unintended, far-reaching, and potentially crippling consequences for the armed services by implying that a military member must be deemed at duty and thus entitled to pay and benefits for any period of absence without leave, even though not excused or avoidable, unless he has been *convicted* of the criminal offense of AWOL under 10 U.S.C. § 886.[5]

---

**3.** The *criminal* offense of AWOL is defined by the Uniform Code of Military Justice:

Any member of the armed forces who, without authority—

(1) fails to go to his appointed place of duty at the time prescribed;

(2) goes from that place; or

(3) absents himself or remains absent from his unit, organization, or place of duty at which he is required to be at the time prescribed;

shall be punished as a court-martial may direct.

10 U.S.C. § 886 (1988).

**4.** Contrary to the view expressed by the district court, the regulation is not limited to commanders of troop units, but extends to all Army commanders with personnel administration responsibilities. Thus, authority to classify sol-

diers AWOL is not nullified even if Major Thomas did not have a "unit commander."

**5.** The district court was plainly incorrect in assuming that simple administrative determinations that a service member was absent from military control and therefore not entitled to pay and/or other renumerative benefits must include the same panoply of due process rights as that provided in a criminal court-martial proceeding. In a criminal AWOL court-martial trial, a service member's life or liberty interest is in jeopardy, clearly implicating the necessity of due process safeguards. In Major Thomas' case, the "punishment" meted out is simply a determination that he was ineligible for benefits covering the period in which he was AWOL. To require that every time the Army—basically acting in its capacity as an employer—makes a determination to "dock" an employee's wages or

To characterize a non-criminal unauthorized absence as an "administrative AWOL" is a reasonable application of the statute and its implementing regulation. Certainly, "administrative AWOL" is a far more preferable term, from the service member's viewpoint, than other phrases the Army could have used to describe Major Thomas' absence, like "non-criminally AWOL," or simply "AWOL."

Accordingly, we hold that section 503(a), as implemented by AR 630–10, does authorize an "administrative AWOL," *i.e.*, no pay status, and therefore we reverse that portion of the district court's decision holding otherwise, and ordering restoration of service credits.

## II

### A

Although the district court found no statutory or regulatory basis existed for an "administrative AWOL" determination, it still ultimately concluded, using its own analytical guideposts, that Major Thomas was not absent without leave, reasoning that since he "was not ordered to be anywhere," he could not be AWOL. *Thomas v. Weinberger*, No. 87–C–378–E, slip op. at 3 (May 17, 1989). The district court found, and the Army agrees, that the Fort Bragg

and Eustis orders were invalid; Major Thomas was under no obligation to accept reassignment anywhere outside the Long Term program's fifty-mile involuntary reassignment limit.[6]

At this point, however, the district court began to confuse a symptom with the disease. The lack of valid reassignment orders is not dispositive of the threshold issue of whether Major Thomas was absent without leave. AWOL means what it says—absent without leave. Invalid reassignment orders are neither decisive nor even relevant to the underlying inquiry of whether Major Thomas absented himself, without authorization, from military control. AWOL, after all, is absence without an express grant of leave (or Army authorization) from a unit or place *or* from military control. That is why, as AR 630–10 ¶ 1–1 provides, the status can be ended by "returning to military control."

Major Thomas was ordered to Southwest Missouri State University for two years to train ROTC cadets, starting in April 1981. When he subsequently refused reassignment orders because the posts were too distant and the Army failed to shorten his two-year tour of active duty, we conclude the consequence was, by operation of law, to leave standing his original

benefits for inexcusable absence, a universe of procedural due process rights arises equal to that in a criminal proceeding, would turn due process on its head. Contrary to the district court's assumption, Major Thomas was not court-martialed, administratively or otherwise. He did not face criminal penalties. Nor did he receive a "stigma-type discharge" which may have triggered a different set of procedural concerns; Major Thomas was apparently allowed to return to the inactive reserve status. Since there was no indication that Thomas was separated from the Army and since the district court explicitly concluded that Thomas "should not ... forfeit retirement or other benefits," we can only conclude that his only loss was those benefits which would have accrued during the AWOL period. If his records now bear any stigma, it is the result of a correct and fair finding that Major Thomas was absent without leave for the period in question. Thomas' records only show that he was administratively AWOL for nine months and that he was not entitled to pay or other benefits for that period. It is clearly similar to any report maintained by

a non-military employer that records an employee's permitted and unexcused absences and their effects on the employee's wages and benefits. There is no indication from the record that Thomas was dishonorably discharged or that he received any other type of a "stigma-bearing" separation from the Army. We cannot, therefore, adopt the dissent's view that this simple administrative notation is the equivalent of "DFRA," "deserter" or other derogatory *discharge* entries. Contrary to the dissent's contention, the records are not "erroneous," and while they may contain unfavorable information, its inclusion is not unfair.

6. Only if the Army had requested us to review whether, once Thomas voluntarily requested reassignment, the fifty-mile limitation was waived, would we turn to the issue of the validity of the reassignment orders and Thomas' obligations under them. At this point, it is unclear why the Fort Bragg or Eustis reassignment orders were invalid, but, since the Army concedes that they were, we will not question that assumption.

orders to Southwest. Thomas never received, nor does he argue otherwise, written orders relieving him from Southwest. Indeed, he received June 8 written orders informing him he was *not* relieved from Southwest, but that his original orders assigning him there remained in force. By their express terms, these orders required Thomas to remain at Southwest until April 1983.[7] Therefore, the district court was clearly in error by ruling that Thomas did not have a place of duty from where he could be absent. He did. It was Southwest.[8] And even Major Thomas recognized this. In listing his options after receiving another set of invalid *re* assignment orders, Major Thomas states that he could have chosen to "stand at Parade Rest in Springfield, Missouri for the next several years awaiting a decision by Army," but instead "opted," while stressing that he was not requesting leave, to "go home in anticipation of good [reassignment] orders." Jt. App. at 21.

As the Army correctly asserts, Major Thomas may or may not have had teaching *duties* at Southwest, but Southwest was still his valid *place of duty*. Indeed, his last valid duty station orders, dated June 8, 1982, revoked the improper assignment to Fort Knox and specifically directed him that the original orders assigning him to

Southwest remained in effect. (Orders R–05–000893R; App. at 34.) As counsel for the Army suggests, if Major Thomas returned to Southwest and was forced to "stand at Parade Rest" rather than being given meaningful duties, he could seek relief under grievance procedures established by 10 U.S.C. § 938 (1988). More importantly, he would not have been AWOL. All Thomas did was inform some Army officials of his whereabouts; he never reported *in person* to Southwest or to any Army base during the nine-month period in dispute.

 The Army concedes that Thomas may have been confused as to his proper duty station. Even so, this confusion, especially on the part of a commissioned officer of over 30 years experience [9], does not entitle Thomas to depart all military control and absent himself without authorization. *See United States v. Vidal*, 45 C.M.R. 540 (1972) (Army regulations and established precedent make clear that active duty members must obtain permission whenever they leave military control); *Switkes v. United States*, 480 F.2d 844, 848, 202 Ct.Cl. 162 (1973); *United States v. Gudaitis*, 18 M.J. 816, 819 (AFCMR 1984). While, as the Army asserts, Southwest was his lawful place of duty, the Army allows that Thom-

---

7. In light of these two sets of valid orders, which were both before the district court, it is surprising that the dissent concludes: "There is *no support* in the record for a conclusion other than that reached by the district court; that Thomas was relieved at [Southwest]." (emphasis added).

8. The dissent points to the fact that Thomas' records originally did not "carr[y him] as AWOL from [Southwest]," but instead from Fort Bragg. Clearly this resulted from Army officials, at that time, believing (wrongly) that the superseding Fort Bragg orders were valid. Whatever the reason, however, the existence of this notation is not probative. This case was initiated to *correct* military records. That we, along with the dissent, have ordered portions expunged and corrected, underscores the record-keeping confusion, admitted by the Army, surrounding Major Thomas' absence. Simply because an Army clerk entered that Thomas was AWOL from a place different than Southwest is no more probative than the "deserter" or "DFRA" notation to the issue of whether Thomas was administratively absent without leave.

9. The dissent suggests that the evidence of his AWOL status for the nine months in dispute "must be considered" in light of Major Thomas' long record of service and observes that his record was one of distinction. However, section 503(a) and the case law are clear: Once a service member is found avoidably AWOL, the Army has no discretion to consider his or her prior service before withholding pay and service credits.

The dissent cites *Midgett v. United States*, 603 F.2d 835, 221 Ct.Cl. 171 (1979) for support. However, that case can easily be distinguished on its unique factual background. In *Midgett*, the service member was deceased and, unlike Thomas, was therefore unable to present his case before the Board. Instead, Midgett's family, along with counsel, developed additional evidence—to be used along with Midgett's service record—that Midgett had died in conflict and thus could not be, as his military records indicated, a "deserter"—a stigma-type *discharge*, quite unlike the administrative pay and benefits determination at issue here.

as could have, at the very minimum, reported *in person* to any military station, thereby avoiding being AWOL, and attempted to clarify both his duty station and *re* assignment orders rather than to simply "go home," write some letters, collect paychecks for nine months for no work, and await new orders. Although, as Thomas argues and the Army does not dispute, he was relieved from teaching duties at Southwest, was invalidly reassigned to Fort Bragg and Fort Eustis, was without any place of *re* assignment, had no new duty to perform, and may have been entitled to early release from the Long Tour Program, Thomas was still absent without leave from Southwest, his last valid place of assignment. Even if Thomas were not absent without leave from Southwest, undeniably he absented himself without leave from military control. No plausible reading of the record and the case law can lead to a contrary conclusion. Therefore, departure from military control forms a second, independently sufficient basis for upholding the Board determination.

B

██ Only now, after determining that Major Thomas was absent without leave between July 22, 1982, and April 10, 1983, do we turn to such factors as whether the conflicting and invalid orders were confusing enough to justify Thomas staying home, and therefore precluding as "unavoidable" his AWOL status.[10]

After review of the record, it would stretch the bounds of reason to conclude that Major Thomas was "unavoidably" absent during the nine months when he abandoned his assigned ROTC post and instead of remaining at Southwest until April 1983,

went home to Tulsa, Oklahoma, and remained there. Although the reassignment orders he received were invalid, Major Thomas cannot use them as a shield against being classified "administratively AWOL." Even if Thomas did not have a valid place of assignment, he was nevertheless obligated to report in person to any Army base, thereby returning himself to military control.[11]

Although Major Thomas did write several letters and make telephone calls prior to August 16, 1982 to clarify his reassignment orders, the record is barren of any attempt after that date to ascertain where he should report or what duties he should perform.[12] In fact, it was only in January 1986, two and one half years after he stopped receiving active duty paychecks, that Major Thomas decided to present himself to military authorities in Texas, he said, to "get this thing settled." There is no indication in the record that Thomas could not have taken this minimal step to "get this thing settled" in July 1982 and thereby avoided any AWOL determination. For this court to validate Major Thomas' action—or inaction—would require us to ignore the Army's unique nature and sanction an administrative nightmare for the military. As the *Switkes* court warned:

All things considered, it is beyond the realm of imagination that any military force in the world could function effectively if individual officers or enlisted men could choose, unilaterally, to which posts they will report and to which not. Or which orders they will obey and which not.

480 F.2d at 848 (footnote omitted).

Therefore, the district court's judgment ordering the Board to expunge all referenc-

---

**10.** AR 630–10 sets out three factors to be considered "before an unauthorized absence may be excused as *unavoidable* ...

(1) The absence was not caused by the member's own misconduct, and

(2) The member acted prudently and responsibly as can be expected to avoid the absence, and

(3) Representatives of the Army also acted prudently and responsibly as can be expected to avoid the absence. (Emphasis added.)"

AR 630–10 ¶ 1–9.b. (Jan. 15, 1980).

**11.** Although the dissent describes the Army's action as "based entirely on the retroactive administrative determination that Thomas was AWOL *from Fort Bragg*" (emphasis added), it is plain that the Army argues that Thomas was correctly found absent without leave from Southwest and from military control.

**12.** Thus, the Board's finding that he failed to act after July 22, 1982 is incorrect as to the first few weeks but indisputably correct for the rest of the nine-month period.

es to "administrative AWOL" in Major Thomas' military records and awarding him pay and appurtenant benefits for the period he was AWOL is reversed and the Board's original "administrative AWOL" determination is reinstated.[13]

### III

■■■ Finally, the Board determined that the several actions purporting to place Thomas in DFRA and deserter status were, as the Army itself concedes, illegal and null, but nonetheless refused to expunge these references from Thomas' military records. The Board's duty is to correct injustice, and it cannot refuse to do so when the record contains derogatory designations that are so incorrect as to be unlawful or are unsupported by substantial evidence. *See Yee v. United States,* 512 F.2d 1383, 1387, 206 Ct.Cl. 388 (1975).

The Board's refusal to correct Thomas' records as to DFRA and desertion was arbitrary and capricious and contrary to law. That portion of the district court's judgment ordering the Board to expunge these references is affirmed.

### CONCLUSION

The district court judgment, to the extent it addresses AR 630-10, Major Thomas'

AWOL designation, and the award of pay or other benefits to Major Thomas for the period July 22, 1982, to April 10, 1983, is reversed. We affirm, however, the district court's order that the Board expunge all references to DFRA and deserter charges from Thomas' records.

### AFFIRMED–IN–PART, REVERSED–IN–PART

### COSTS

Each party is to bear its own costs.

PAULINE NEWMAN, Circuit Judge, concurring in part, dissenting in part.

I join that portion of the majority opinion that affirms the district court's judgment ordering the board to expunge the references to the DFRA and deserter charges. However, I must dissent from the reversal of the district court's judgment on the charge of "administrative AWOL", for on the found facts and the clear law the district court's holding must be affirmed.

### *Standard of Review*

A decision of a Board for Correction of Military Records, when adopted by the Secretary, 10 U.S.C. § 1552(a),[1] is subject to

---

**13.** The dissent asserts that we ignore "clear and established" law in ruling that Thomas, because he was avoidably AWOL, is not entitled to pay or benefits for that period. The dissent correctly notes that "military pay is fixed by statute and depends on the member's *status,* not his or her actual service" (emphasis added). But the Army is not arguing that Thomas is ineligible for military pay and benefits because he did not teach Military Science at Southwest, or perform duties at Fort Bragg, Fort Eustis or Fort Knox. Instead it correctly contends that, by unilaterally leaving Southwest, Thomas not only left his assigned place of duty, but, for purposes of awarding pay and other benefits, he also left the Army. *See Switkes,* 480 F.2d at 846 (AWOL is a classification different from active duty).

The dissent relies heavily on *Bates v. United States,* 453 F.2d 1382, 197 Ct.Cl. 35 (1972). Although in *Bates* the court was concerned with the proper type of "leave" classification (in this case, "excess leave"), there was no question Bates had been granted "leave." Thomas, however, was absent *without leave.* The dissent notes that, like Thomas, Bates remained at home. But where Thomas was is not relevant

to our disposition, only where he was not. Nor is it relevant to our disposition that Thomas collected military paychecks, although we do question the dissent's assertion that Thomas "could not afford" to remain at Southwest even though he continued to receive, without interruption, his full salary.

Also cited for support by the dissent are *Midgett v. United States,* 603 F.2d 835, 221 Ct.Cl. 171 (1979), *Duhon v. United States,* 461 F.2d 1278, 198 Ct.Cl. 564 (1972) and *Clackum v. United States,* 296 F.2d 226, 148 Ct.Cl. 404 (1960). However, those cases deal with a failure to remedy *errors* in a service member's records, while here, we have found that the "administrative AWOL" notation was *correct.*

**1.** 10 U.S.C. § 1552(a) (in pertinent part):

The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice.

judicial review. *Chappell v. Wallace*, 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983). Review may be had by the district court under the "Little" Tucker Act when the jurisdictional requirements of 28 U.S.C. § 1346(a)(2) are met. As discussed in *Heisig v. United States*, 719 F.2d 1153 (Fed.Cir.1983), the district court reviews the findings of a military correction board to determine whether the action was arbitrary or capricious or taken in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory procedure, with resultant serious prejudice. *Id.* at 1156, *citing Clayton v. United States*, 225 Ct.Cl. 593, 595 (1980).

Although the government in its briefs tends to ignore the district court's findings and conclusions, and indeed to treat that proceeding as a nullity, the Federal Circuit does not review directly the findings or conclusions of the board, when review was had in the district court. The Federal Circuit reviews the district court's findings of fact for clear error, Fed.R.Civ.Proc. 52(a), and its conclusions of law for correctness. *Heisig*, 719 F.2d at 1158.

### *Background*

The following historical facts are undisputed, or are as found by the district court on review of the record and the findings of the board in light of the record. I shall point out the conflicts between the findings of the board and the district court.

Major Thomas' military service began in 1950. In 1981 he held the rank of Major, United States Army Reserve. He had been awarded the Bronze Star Medal with Oak Leaf Cluster, the Air Medal, the Combat Infantryman Badge, the Vietnam Service Medal, and the Republic of Vietnam Campaign Medal. He completed the Command and General Staff College in 1976, and holds M.A. and Ph.D. degrees from the University of Southern California. Until the events here at issue there was no cloud on his military record.

Thomas voluntarily left inactive reserve status in April 1981 to participate in the Active Guard/Reserve (AGR) "two-plus-two" program, which consisted of a two-year tour of duty with a possible two-year extension. The assignment, teaching Military Science at Southwest Missouri State University (SWMSU) to Reserve Officer Training Candidate (ROTC) cadets, was under the Army Reserve Long Tour Management Program. This program provided for officers to perform their tour at the original chosen place of assignment, and prohibited involuntary reassignment to a duty station greater than fifty miles from the original place of assignment. Thomas, whose home was in Tulsa, Oklahoma, had selected this place of assignment because of its proximity to his son's home in Missouri.

Less than a year into the assignment, and as the district court found due to a "potential scandal involving his commanding officer",[2] the commanding officer told Thomas that he would be relieved of his duties at SWMSU. The officer offered Thomas the choice of requesting reassignment "without prejudice". Thomas agreed, and in February 1982 he requested such reassignment. The officer then violated the "without prejudice" promise and entered on Thomas' record unfavorable comments about his performance. (The Office of the Inspector General termed this action "unfortunate", and advised that the personnel records could be corrected by the board.)

On May 13, 1982 Major Thomas was ordered to report to Fort Knox, Kentucky by June 1, 1982. By orders dated June 8, 1982 the Fort Knox orders were revoked, the revocation stating that the original assignment to SWMSU remained in effect. Meanwhile Thomas had been ordered to, and participated in, duty at a ROTC Advanced Camp at Fort Riley, Kansas from June 7 to July 21, 1982. Although the majority criticizes Thomas' actions after this tour, the board did *not* find that he was still assigned to SWMSU. The district

---

**2.** Nothing in the record suggests that Major Thomas was himself involved in the scandal; there is only the suggestion that Thomas pos- sessed knowledge of the incident, which led to conflict with his commanding officer Curbow.

court expressly found that he had been *relieved* at SWMSU, and that the Army had concluded that he was relieved at SWMSU. Neither the board nor the district court found, as does the panel majority (without any record support), that Thomas was AWOL from SWMSU.

On June 28 Thomas declined reassignment to Fort Bragg, North Carolina, or Fort Eustis, Virginia; both locations were beyond the fifty mile limit of the Long Tour program.

On August 3, 1982 Thomas was ordered to Fort Bragg, North Carolina, for reporting on August 16, 1982, for an active duty term of two years ending August 15, 1984. (The term was later corrected to end on April 10, 1983, the correct two-year tour date.) In accordance with the Long Tour program, Thomas declined the reassignment to Fort Bragg. While the Army's brief opines that Thomas "changed his mind" about reassignment because of the unfavorable comments wrongfully placed on his record by his superior officer, *see supra,* neither the district court nor the board made findings to this effect. However, the district court referred to various exchanges and correspondence as to this reassignment. For example, in response to Thomas' inquiries Colonel David M. Fleming II, Chief of the Long Tour Management Office, wrote to Thomas on July 29, 1982, stating that:

> Declination of this assignment [to Fort Bragg] will constitute a termination of AGR status in accordance with existing policy and procedures.

This information was contradicted by other information and advice given to Thomas, in what the district court called a "military nightmare of conflicting and invalid orders".

On July 30, 1982, Thomas wrote to the Office of the Judge Advocate General in Washington, D.C. The text of the letter follows:

> Dear Sirs:
>
> 15 months ago I returned to active duty for the express purpose of teaching ROTC (Incl 1). My superiors are and have been attempting to reassign me against my will.
>
> Can I be reassigned against my will under the authority of 10 U.S.C. 672(d)? Under no conditions do I want to violate the UCMJ. I have a report date of 16 Aug 82 and, if to do otherwise would place me in violation of the UCMJ, I will report and do my duty to the best of my ability.
>
> Time is of the essence, and I am [in] desperate need of your assistance.

The letter was referred to the Office of the Chief, Army Reserve, which office responded that the Fort Bragg orders were "published in accordance with your request for reassignment dated 19 February 1982. Accordingly, it does not appear that your reassignment is involuntary". This response made no mention of the fifty mile limit of the Long Tour program.

On August 4, 1982 Thomas wrote to Colonel Fleming, again inquiring about his status, referring to telephone conversations in which he had received contradictory instructions. The record does not show Col. Fleming's reply. The district court stated that on August 17, 1982 Thomas called and arranged an appointment to see Colonel Ondecker at Ondecker's motel in Springfield, Missouri. The board referred to an August 27 meeting in Springfield with an "investigating officer" (perhaps the same meeting; there are several imprecisions in the record) and stated that on September 2 the officer "briefed a RCPAC [Reserve Components Personnel and Administrative Center] colonel ... and requested that [Thomas'] status be resolved".

On Sept. 3, 1982 Colonel Ondecker wrote to Brigadier General Smith that "The JAG's opinion was that RCPAC's only recourse is to terminate Major Thomas' AGR status", and that he had advised Thomas that he was relieved at SWMSU and was AWOL from Fort Bragg. Thomas sent notice that he was awaiting valid orders, and returned to his home in Tulsa, Oklahoma. The Army sent Thomas' military pay to him in Tulsa, through June 1983.

On October 25, 1982 Fort Bragg issued DFRA (Dropped from the Rolls of the

Army) orders, effective retroactively to September 15, 1982. On October 28, 1983 the Military Personnel Center revoked the DFRA action. On April 20, 1984 the Army assigned Major Thomas from the U.S. Army Reserve Control Group (Reinforcement) to Fort Bragg, effective retroactively to September 15, 1982, and notified him that he was retroactively AWOL from Fort Bragg and dropped from the rolls of the Army (DFRA) as of October 15, 1982. On April 25, 1984 he was designated a deserter.

Thomas sought correction of his military records and other relief, initiating these six years of judicial and administrative proceedings. He has never been tried by court-martial in accordance with 10 U.S.C. § 886, although he so requested to clear his record.

### The Board Proceedings

In the course of processing Thomas' request for correction of his military records, the board sought advice from the Judge Advocate General and the Deputy Chief of Staff for Personnel. On May 30, 1985 the Army Reserve Personnel Center wrote:

> When the applicant declined reassignment, RCPAC's only options were to allow his period of service at SWMSU or elsewhere to end as originally specified or publish new orders adjusting the active service obligation.

On July 24, 1985 the Judge Advocate General gave similar advice:

> The applicant could have validly refused reassignment to Fort Bragg because it was not within commuting distance of his current assignment. Upon refusing reassignment, the applicant should have had his AGR status terminated or have been informed that his service was to end pursuant to his original orders. Neither action was taken.

Implementing this advice in part, the board held that "the reassignment orders had no legal validity". However, the board refused to correct the Army's holding that Thomas was "administratively AWOL" after July 22, 1982, stating, contrary to the record, that "there is no evidence that he timely attempted to resolve his status in the 22 July 1982 through 10 April 1983 period of time".

The board also found that all actions placing Thomas in DFRA and deserter status were a "nullity". However, the board refused to remove these references from his military records.

### The District Court Proceedings

On appeal of the board's decision, the district court observed that Thomas had no authorized place of duty after July 22, 1982, and that Thomas had remained at SWMSU at least until August 17, 1982. The court concluded that Thomas validly declined the assignment to Fort Bragg, affirming the board on this issue, and that Thomas had been relieved at SWMSU. The district court held that Thomas could not have been AWOL when he had no place of assignment, and that the board's holding to the contrary was incorrect.

Discussing the board's finding that Thomas did not timely attempt to resolve his status, the court discussed the evidence of Thomas' attempts to do so, and concluded that "Thomas *did* display an abiding interest in timely resolving his situation". (Emphasis in original.) The court referred to "the confusing collage of vaporous orders and commands splattered through the record," and stated that "the record is replete with many letters from Thomas seeking direction".

The district court concluded that the board failed to properly review the record, that the government's position "ignores . . . Thomas' own documented attempts to resolve his situation," and that the board's finding to the contrary was unsupported by substantial evidence. The court reported that at argument the Army "acknowledged that the responsibility for action *lay with the Army*". (Emphasis in original.) The court observed that Thomas "was not hiding and remained ready for valid orders."

The district court concluded that the board's ruling that Thomas was "administratively AWOL" was arbitrary and without basis in law, and unsupported by substantial evidence. The court held similarly

with respect to the board's refusal to remove the record references to "deserter" and "DFRA" despite the board's holding that these were a "nullity".

### Administrative AWOL

During the hearing before the district court, the magistrate inquired of the government about the statutory and regulatory authority for the designation "administrative AWOL". Provided with none, the magistrate reported that:

> Counsel for the Secretary, during hearings before the Magistrate, could not find any regulatory basis for an "administrative AWOL" nor articulate its origins in law. The Magistrate's own research, with the aid of the library resources of the Tenth Circuit, has found only *one* case noting an "administrative" class of AWOL. However, that case was based on a 1953 Army Regulation which has no present day existing equivalent. [Emphasis in original.]

The government requested reconsideration, stating with that request that Army Regulation (AR) 630–10 authorized such a determination. Reconsideration was granted, with further argument.

AR 630–10 was described as containing guidance and procedures for Unit Commanders in "determining and reporting members who are AWOL or DFR". (Its purpose is not, as the majority suggests, to protect the public treasury.) The district court observed that AR 630–10 does not define or use the term "administrative AWOL", and the court described it as "seemingly, a status necessitated until more information is available." The government has pointed to no error of law in this analysis.

The district court concluded that there was no statutory or regulatory authority for the Army to have declared Thomas "administratively" AWOL. The court also held that (1) the Army did not follow the provisions of AR 630–10; (2) Thomas was not afforded a hearing; and (3) in all events, Thomas was not AWOL because he was not absent from any post to which he had validly been assigned. The district court found that the Army itself recognized that Thomas was relieved at SWMSU. The district court held:

> Upon the Army's failure to either *inform* Major Thomas that he was to serve out his term at SMSU, or, to adjust (shorten) his active (AGR) time, it cannot now hold him to be "A.W.O.L.", administratively or otherwise, during the period remaining after he *properly* declined reassignment.... He could not report back to SMSU because Col. Ondecker advised ("informed") him he was relieved. He did not have to report to Fort Bragg, because it was an illegal order. He had no other place to go.
>
> "Administrative AWOL" is not the determining factor in this case. No unit commander acted; indeed, no one knew who was Thomas' commander. Rather, as discussed, the failure of the Army, at higher levels, to properly address Major Thomas' situation is at the heart of this situation. Major Thomas thus fell into a "crack," and it was incumbent on the Army to inform him of what his proper course of action should be, or, to shorten his active duty commitment to the point where he properly declined reassignment. *These are conclusions which the Army itself reached in 1985.* [Emphases in original.]

No error in fact or law has been shown in these conclusions or their premises. As the district court observed, the government provided no authority, rule, or regulation, to support the board's holding a person AWOL who is without valid orders, who has no place of assignment, who is not missing, and whose location is known to the military authorities.

The majority now finds that Major Thomas' proper place of assignment was SWMSU. No preceding tribunal so found. Major Thomas was never carried as AWOL from SWMSU. Thomas states that Colonel Ondecker told him that he "could not, under any conditions, return to SMSU". Thomas also states that "the option to complete my tour at SMSU had been denied me categorically both by COL Ondecker (speaking for Major General Louis Wagner,

Commanding General, Fort Knox and for the Secretary of the Army) and by COL Fleming (speaking for the USAR)". The action at bar is based entirely on the retroactive administrative determination that Thomas was AWOL from Fort Bragg, to which he was not validly assigned, as the Army agrees, and indeed as the panel majority agrees.

The district court referred to the Army's *"post hoc* maneuverings in belief Thomas should be considered AWOL are evidenced in part by its actions in 1984." As found by both the board and the district court, the Army Reserve Personnel Center, having revoked in October 1983 the DFRA orders of a year earlier from Fort Bragg, on April 20, 1984 issued new orders retroactively reassigning Thomas to Fort Bragg as of September, 1982. Also on April 20, 1984, officials at Fort Bragg sent a letter to Thomas' home stating that he "has been absent without official leave from this organization since September, 1982", changed Thomas' status from "In transit" to AWOL retroactive to September 16, 1982, and changed his duty status from AWOL to DFRA retroactive to October 15, 1982. On April 25, 1984 Fort Bragg sent notice to the Provost Marshall Office that Thomas was a deserter. It is testimony to the "confusing collage of vaporous orders and commands splattered through the record", in the district court's words, that Thomas' place of assignment, if any, remained unknown.[3]

In contrast, as found by the district court and in harmony with the board's findings, Thomas selected SWMSU as his initial place of assignment because of its proximity to his son's home. Thomas stated that he would not have voluntarily departed from SWMSU, and the record is undisputed that he was forced by his commanding officer Curbow either to leave SWMSU or to request reassignment without prejudice

(a promise that was broken by Curbow). There is no support in the record for a conclusion other than that reached by the district court; that Thomas was relieved at SWMSU.

While the government argues that the board must be assumed to have "considered and properly applied the provisions of AR 630–10", such assumption is not immune from judicial review. It is highly significant that the *board* made no reference to AR 630–10 in its decision. The Supreme Court has stated:

[G]rounds not relied on by a government agency cannot be invoked to validate an exercise of administrative discretion which has in fact been based on insufficient grounds or reached without requisite procedural safeguards, see, *e.g., Securities & Exchange Comm'n v. Chenery Corp.,* 332 U.S. 194, 196 [67 S.Ct. 1575, 1577, 91 L.Ed. 1995]; *Bell v. United States,* 366 U.S. 393, 412–13 [81 S.Ct. 1230, 1240–41, 6 L.Ed.2d 365]; *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 167–68 [83 S.Ct. 239, 245, 9 L.Ed.2d 207]....

*Massachusetts Trustees v. United States,* 377 U.S. 235, 247, 84 S.Ct. 1236, 1244, 12 L.Ed.2d 268 (1964).

The board's finding that Major Thomas had no valid orders has not been disputed by the government. Even the board did not find that Thomas was still assigned to SWMSU. The district court concluded that it was not possible for Thomas to be absent from a duty station to which he was not validly assigned. Thomas' several inquiries did not elicit a valid assignment, or other valid action, from the Army. As noted by the district court, while AR 630–10 "provides guidance and procedures" to unit commanders in making decisions involving absent personnel, no unit commander made a decision or acted. Indeed, the district court found, and the govern-

---

**3.** In finding today that Major Thomas was still assigned to SWMSU the majority quotes, apparently as an admission against interest, Thomas' statement in his complaint that he could have chosen to "stand at parade rest in Springfield, Missouri for the next several years awaiting a decision by Army". The district court rejected

the idea that Thomas was required to remain at Springfield, and found "It could be reasonably assumed that Thomas returned home out of desperation, unable to afford a continued wait in Springfield. In any case, he was not hiding and remained ready for valid orders." *Thomas v. Weinberger,* slip. op. at 12.

ment does not dispute, that no one in the Army knew who Thomas' unit commander was.[4] The district court's conclusion that AR 630–10 does not support holding Major Thomas to be administratively AWOL, and that no other authority has been invoked for imposing this status on Thomas, has not been shown to be incorrect as a matter of law.[5]

In reviewing an administrative determination, a fundamental inquiry is whether the agency complied with its own regulations. *Service v. Dulles*, 354 U.S. 363, 372, 77 S.Ct. 1152, 1156, 1 L.Ed.2d 1403 (1957) ("regulations validly prescribed by a government administrator are binding upon him as well as the citizen, and that this principle holds even when the administrative action under review is discretionary in nature"); *Conn v. United States*, 376 F.2d 878, 180 Ct.Cl. 120 (1967) (invalidating a less-than-honorable discharge after determining that the Navy had failed to follow its own regulations governing investigation and "nonjudicial punishment").

The district court held that the board's conclusion that Thomas did not seek to resolve his status is unsupported by the record. The district court stated that "the record is replete with many letters from Thomas seeking direction", that it was the Army's responsibility to assign Thomas to a place of duty within the AGR program, and that the Army knew it had not done so.

The majority now concludes that Thomas, who presented himself to military authorities in Texas in 1986, requesting a military trial on the charges against him to "get this thing settled", should have done this in July 1982 and "thereby avoid[ ] any AWOL determination." But Thomas did present himself to Colonel Ondecker in 1982, and wrote several letters in an at-

tempt to get it settled. He stated that "[e]ach day" he expected valid orders to arrive. No action was forthcoming, and indeed a year and a half elapsed, long after his tour officially ended, before he was retroactively declared AWOL.

As the district court observed, responsible Army officials knew that the orders to Fort Bragg were invalid. Thomas' location was known, and indeed the Army sent his regular checks to his home in Tulsa. The record shows several instances of advice from the Office of the Judge Advocate General to the Army officials at the time; advice that the Army ignored.

The Army has conceded that Major Thomas was not required to obey invalid orders.

No corrected orders, or valid reassignment, or even separation from the AGR program, was forthcoming despite Thomas' several inquiries and letters. The district court referred to various contradictory findings and statements of the board, such as the board's holding that Thomas' active duty military status ended on July 21, 1982 (conclusion 8), the date relied on to deprive him of military pay, which contradicted the board's conclusions 1 and 4 that his active duty military status ended on April 10, 1983, the date relied on to declare him AWOL for the period from July 22, 1982 through April 10, 1983. The court noted the board's own recommendation that Thomas' records be corrected to show April 10, 1983 as the date of termination of his active military status.

The majority today decides an issue that the Supreme Court had refused to decide because of the far-reaching implications of "administrative" determinations of AWOL. In *Bell v. United States*, 366 U.S. 393, 412, 81 S.Ct. 1230, 1240, 6 L.Ed.2d 365 (1961)

---

**4.** AR 630–10 ¶ 1–4g states:

 **1–4g. Unit Commander.** The clerical responsibility for documenting the AWOL, return to military control, and disciplinary action may be delegated to a Personnel and Administration Center (PAC). Unit commanders, however, are responsible for determining and reporting members who are AWOL or are DFR. This AR provides guidance and procedures to assist unit commanders in making these decisions. It covers a

variety of circumstances, but it is not all-inclusive. In cases of doubt, the final decision must be based on the judgment of the commander after considering the facts of each case.

**5.** I can not share the majority's view that declaring a person AWOL while refraining from criminal prosecution is no more than a "mere administrative notation".

the Court observed that "desertion and absence without leave are technically defined offenses", and declined to decide whether the Secretary has power under the statute to make such a determination "administratively" (in the context of American soldiers who stayed in North Korea):

The legislative history discloses that the provision denying pay to a person officially determined to have been "absent from his post of duty without authority" was enacted to cover the case of a person found to have been "missing" in the first place only by reason of such unauthorized absence. Moreover, *desertion and absence without leave are technically defined offenses.* It is open to serious question whether the conduct of the petitioners after their capture could conceivably have been determined to be tantamount either to desertion or absence without leave. These are questions which we need not, however, pursue. *We need not decide in this case that the Secretary of the Army was wholly without power under the statute to determine administratively* that the petitioners after their capture were no longer in the active service, or that they were absent from their posts of duty. Nor need we finally decide whether either such determination by the Secretary would have been valid as a matter of law. [Emphases added, citations and footnote omitted.]

We too need not and should not decide the broad question of the possible reach of an administrative determination of AWOL, for unlike the Korean situation, Thomas was not hiding and was not absent from any assigned post of duty. On the precedent of *Bell,* I express grave concern at the majority's ready endorsement of an administrative determination of AWOL for which there is no clear authority, either in law, or in the only regulation that the Army cited when pressed by the district court. *See Conn v. United States,* 376 F.2d 878, 881, 180 Ct.Cl. 120 (1967) ("Applicable regulations, and therefore the fundamentals comprising due process, must be honored both in letter and spirit").

In harmony with the concerns expressed by the Court in *Bell,* the district court held that the Secretary had circumvented the due process protection of court-martial proceedings by declaring Major Thomas "administratively" AWOL. *See Carter v. United States,* 518 F.2d 1199, 1202, 207 Ct.Cl. 316 (1975), *cert. denied,* 423 U.S. 1076, 96 S.Ct. 861, 47 L.Ed.2d 86, *reh'g denied,* 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 356 (1976) ("a regular officer cannot legally receive a stigma-type discharge after mere administrative proceedings of any kind"); *accord Sims v. Fox,* 505 F.2d 857, 864 (5th Cir.1974) (employee's "liberty" is right not to be *"wrongfully* stigmatized by untrue and *unsupported* administrative charges") (emphasis in original) (quoting *Arnett v. Kennedy,* 416 U.S. 134, 163, 94 S.Ct. 1633, 1648, 40 L.Ed.2d 15 (1974)). This precedent, which weighs against the majority position, acquires critical importance and can not be ignored if the district court's judgment is to be reversed.

Even on the view of the panel majority that Major Thomas should have done more to straighten out his status and should have gone anywhere but home, the evidence must be considered in light of Major Thomas' military background and record. *Midgett v. United States,* 603 F.2d 835, 844, 221 Ct.Cl. 171 (1979). From 1950 through 1981 Thomas served in the active and reserve service, and the record before us shows more than routine distinction. Contrary to the majority's assertion, Thomas' "punishment" is not merely the denial of benefits. Courts have long taken cognizance of the stigma inflicted by failure to correct erroneous military records:

The military are not permitted to return persons to civil life with an unfair and derogatory characterization of their military service, attached without strict conformity to law, and full due process protection.

*Id.,* 603 F.2d at 848. In *Duhon v. United States* the court stated:

[M]ilitary correction boards "have an abiding moral sanction to determine, insofar as possible, the true nature of an

alleged injustice and to take steps to grant thorough and fitting relief."

461 F.2d 1278, 1281, 198 Ct.Cl. 564 (1972) (quoting *Caddington v. United States,* 178 F.Supp. 604, 607, 147 Ct.Cl. 629 (1959)). The board's duty is to correct injustice, and the reviewing court must assure itself that the action taken is correct, and supported by substantial evidence. *See Yee v. United States,* 512 F.2d 1383, 1387, 206 Ct.Cl. 388 (1975); *Clackum v. United States,* 296 F.2d 226, 228, 148 Ct.Cl. 404 (1961) ("[I]t is unthinkable that [the Air Force] should have the raw power, without respect for even the most elementary notions of due process of law, to load [the reservist] down with penalties").[6]

The record, and the facts as found by the district court and indeed as found by the board, require affirmance of the district court's holding that the board erred in law in holding Major Thomas to be administratively AWOL. The board's discretionary authority does not extend to refusal to correct a service member's military records when the underlying action is invalid. The district court's judgment ordering the board to expunge all references to AWOL should be affirmed.

*Pay and Retirement Points*

The board held that Thomas was not entitled to pay or retirement points after July 22, 1982 because he had no active military status after that date. The government relies on 37 U.S.C. § 503(a), which provides:

(a) A member of the Army ... who is absent without leave or over leave, forfeits all pay and allowances for the period of that absence, unless it is excused as unavoidable.

Having found that Major Thomas was relieved at SWMSU and not validly assigned to Fort Bragg, and consequently not AWOL, the district court applied the law correctly in upholding pay and retirement points to Major Thomas. The only remain-

ing rationale advanced by the government for denying these benefits is that Thomas "waited idly at home", *i.e.,* that he performed no military service.

The law governing military pay is clear and established, and the district court was correct in holding that the law was erroneously applied by the board. In *Bell,* 366 U.S. at 401–402, 81 S.Ct. at 1235, the Supreme Court reaffirmed that even the violation of the obligation of faithful service does not deprive servicemen of pay. While the government now argues that the policy of AR 630–10 is to prevent payment for services not rendered, this position is contrary to law. In *Werner v. United States,* 642 F.2d 404, 226 Ct.Cl. 462 (1981) the court stated:

At oral argument, [government] counsel asserted—not seriously, we believe—that a member of the military is entitled to the pay and allowances attendant to his military grade and status only if he has rendered military services in exchange for these emoluments.

642 F.2d at 408. Holding that Werner was entitled to his military pay as a matter of law, the Court of Claims referred to over one hundred years of authority contrary to the government's position. *Id.* at 409. See also *Silver v. United States,* 551 F.2d 295, 297, 213 Ct.Cl. 388 (1977), wherein the court stated that

while Congress certainly could have conditioned entitlement on the actual rendition of professional services, it did not do so. Instead, the unambiguous language of the statute predicates eligibility solely on appointed status.

Close analogy is seen to the facts of *William Bates v. United States,* 453 F.2d 1382, 197 Ct.Cl. 35 (1972). Bates had enlisted in the Air Force for a four-year period beginning Feb. 23, 1965, and served in Vietnam until May 12, 1968. He was ordered to return to the United States, without assignment to any military base, and he returned to his home town. No further

---

**6.** This is not a matter of relative "stigma": the majority suggesting that a military person should complain less about the stigma of a non-criminal "AWOL" than the stigma of

"deserter". I can discern no such refinement of purpose in 10 U.S.C. § 1552, which authorizes the correction of military records "to correct an error or remove an injustice".

orders were received, and upon inquiry, the Air Force responded that "your future assignment is as much a mystery as ever". He remained at home for nine months, during which time he obtained civilian employment.[7] Bates was carried on an excess leave status during the period he remained at home. Under 37 U.S.C. § 503(a), *supra*, for pay purposes over leave status is treated identically with AWOL status.

The Secretary of the Air Force later corrected Bates' military record to show that he had not been charged with excess leave, but had served on active duty during this period. The Air Force did not declare Bates "absent from military control" even though he remained at home for the same period as Thomas and had not reported in person to "any" military installation, as the majority finds that Thomas should have done.

No "administrative nightmare", as anticipated by the majority, has since appeared. Thomas remained ready for valid orders. Indeed, Thomas referred to a letter from the Reserve Components Personnel and Administrative Center dated March 10, 1983, addressed to him at his Tulsa address, informing him that he was being considered for retention under the program.

In sum, the Army could have terminated Major Thomas' Active Guard/Reserve status at the time he declined the Fort Bragg orders, as was expressly recognized at the time by Colonel Fleming and others. It did not do so. The board held that Thomas' active duty status did not end until April 10, 1983, and the district court correctly awarded Thomas the pay and benefits of active duty status during the period July 22, 1982 through April 10, 1983, and inactive status thereafter, including appurtenant veteran's benefits and retirement

points.[8] I would affirm the district court's judgment, for its findings have not been shown to be in clear error, or its conclusions incorrect in law.

---

**7.** In *Bates* the court held that the military back pay for the period Bates remained at home was not subject to offset, because military pay is fixed by statute and depends on the member's status, not on his or her actual service.

**8.** The issue is not simply Thomas' entitlement to pay and benefits for the nine months in question, as the majority suggests; it appears from the record that the Board's decision adversely

affected Thomas' reservist career. The majority's statement that he "should not ... forfeit retirement or other benefits" is a quotation from the decision of the district court, which is here being reversed.

There can be no stigma attaching to the attempt to preserve the benefits earned over a lifetime of military service.