**Daniel A. SWITKES**
**v.**
**The UNITED STATES.**
**No. 702-71.**

United States Court of Claims.
June 20, 1973.

Davis and Nichols, JJ., dissented and filed separate opinions.

———◆———

David Rein, Washington, D. C., atty. of record for plaintiff. Forer & Rein, Washington, D. C., of counsel.

Arthur E. Fay, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

## OPINION

KUNZIG, Judge, delivered the opinion of the court: *

Plaintiff, in this military pay case, is suing to recover an amount representing the pay and allowances of an Army Captain from May 16, 1970 through April 9, 1971. After being admittedly absent without leave (AWOL), plaintiff obtained two separate federal court orders which had the effect of restraining the Army from sending him to Vietnam.

In issue is whether the federal court orders or any other event changed plaintiff's AWOL status thus entitling him to pay and allowances for the period in question.

It is our opinion that plaintiff is not entitled to total recovery. He may recover for only those periods in which he was in compliance with his orders.[1]

Plaintiff, who at the time was a Captain in the United States Army Reserve and a medical doctor, was called to active duty in September 1969. He began an extended tour of active duty on September 17, 1969.

In April 1970, while plaintiff was assigned to the Ireland Army Hospital at Fort Knox, Kentucky, he received orders which directed him to report to Travis Air Force Base in California by June 12, 1970, for shipment to Vietnam. Plaintiff was authorized to take a period of leave in connection with the change of duty station; he departed from Fort Knox on or about May 20, 1970, thus beginning his period of authorized leave. This leave was extended twice, changing his reporting date at Travis Air Force Base to July 20, 1970. Plaintiff went to California, but did not report to Travis; nor did he report to Vietnam.

The next orders that plaintiff received were those of April 7, 1971, directing him to report to Fort Hamilton, New York, for the purpose of being released from the Army. He complied, and on April 9, 1971, was formally discharged from the Army.

Plaintiff contends that he was either on active duty or authorized leave during the entire period with the sole exception of a four day period which occurred between the time that he was supposed to report to Travis and the date of the restraining order issued by the United States District Court for the Eastern District of California. Accordingly he claims that he is entitled to pay and allowances from May 16, 1970 to April 9, 1971, excluding those four days.

In order to clearly understand plaintiff's position, a chronology of events is necessary:

> *1962–1967*—Plaintiff received a military deferment in order to attend medical school.

---

* We acknowledge the able assistance rendered us by Commissioner Mastin G. White's findings and recommended opinion in this case. Such findings of fact as are necessary to the opinion are included therein.

1. Actual computation of the amount of recovery will be determined by the Trial

Commissioner pursuant to Rule 131(c). Consideration will have to be given to the amount of leave time that plaintiff had accumulated in order that final judgment is not contrary to 37 U.S.C. § 502 (1970), which limits the amount of leave pay.

*November 1967*—Plaintiff applied for and was denied conscientious objector status.

*September 19, 1968*—Plaintiff applied for, was tendered, and accepted an appointment as a commissioned officer, United States Army Reserve.

*September 17, 1969*—Plaintiff voluntarily entered on active duty.

*April 23, 1970*—Plaintiff received orders to report to Travis Air Force Base in California for shipment to Vietnam.

*May 20, 1970*—Plaintiff went on authorized leave prior to reporting to Travis Air Force Base.

*June 6, 1970*—Plaintiff applied to the United States District Court for the Southern District of New York (hereinafter referred to as New York court) for a writ of habeas corpus on the grounds that the denial of his conscientious objector application had been erroneous.

*June 9, 1970*—New York court issued a restraining order which restrained the military authorities from removing plaintiff from the Southern District of New York pending consideration of his petition for a writ of habeas corpus.

*July 2, 1970*—New York court dismissed plaintiff's petition, leaving the restraining order in effect until July 7, 1970.

*July 20, 1970*—Plaintiff failed to report to Travis Air Force Base for shipment to Vietnam as ordered. Plaintiff also did not report to Vietnam.

*July 24, 1970*—Plaintiff filed in the United States District Court for the District of Eastern California (hereinafter referred to as the California court) another petition for a writ of habeas corpus, again seeking to obtain his discharge. The court immediately issued a restraining order which restrained the military authorities from removing plaintiff from the Eastern District of California pending consid-

eration of his petition. Travis Air Force Base is in said District.

*November 9, 1970*—California court's restraining order was superseded by a preliminary injunction to the same effect.

*February 9, 1971*—California court dissolved preliminary injunction effective February 11, 1971.

*February 9, 1971*—Petitioner filed a third petition for writ of habeas corpus in the United States District Court for the District of Columbia (hereinafter referred to as the D.C. court), once more seeking to obtain his discharge from the Army. The court immediately issued a restraining order which restrained the military authorities from transferring plaintiff to overseas duty pending disposition of his petition.

*March 3, 1971*—California court dismissed the petition pending before that court.

*March 22, 1971*—D.C. court entered a judgment holding that plaintiff had been unlawfully inducted into the armed services, granting the writ of habeas corpus, and ordering plaintiff's discharge from the Army.

*April 7, 1971*—Plaintiff received orders to report to Ft. Hamilton in New York for the purpose of being discharged from the Army.

*April 9, 1971*—Plaintiff was discharged from the Army.

During the entire period from July 20, 1970 until April 7, 1971, plaintiff did not physically report to any military installation.

■ Although we do feel that plaintiff is entitled to recover for the periods when he was in compliance with his military orders, May 16, 1970 to July 20, 1970 and April 7, 1971 to April 9, 1971, the remaining time is irrevocably tainted by his going AWOL on July 20, 1970. In the entire chain of events subsequent to July 20, 1970, the only event which altered his AWOL status was the order

received on April 7, 1971, to report to Ft. Hamilton.

Fortunately there is a clear and unambiguous statute concerning members of the armed services who are absent without leave. Title 37, Section 503(a) of the United States Code reads:

> A member of the Army, Navy, Air Force, Marine Corps, Coast Guard, or Environmental Science Services Administration, who is absent without leave or over leave, forfeits all pay and allowances for the period of that absence, unless it is excused as unavoidable.

Since plaintiff has admitted that he was AWOL when he failed to report on July 20, 1970, there only remains a determination as to the length of the period of absence and whether or not the absence was excused as unavoidable.

■ Plaintiff's primary contention is that the period of his being absent without leave covered only four days. He argues that the issuance of the California restraining order on July 24, 1970 changed his status from AWOL to active duty status awaiting orders to report to a particular assignment.

Plaintiff's rationale for this contention is premised upon the assumption that since the Army was restrained from sending him to Vietnam and since he was on orders to report to Vietnam, that the court order superseded his military orders and he was no longer AWOL. This just is not the case.

The California restraining order did not expressly restrain the military authorities from sending plaintiff to Vietnam. Rather the order restrained and enjoined the military "from removing petitioner from the Eastern District of California". Therefore, plaintiff could

properly have remained on military duty anywhere within this District. Plaintiff has readily admitted throughout these proceedings that he was on orders to report to Travis Air Force Base which lies within the Eastern District of California. It was so stipulated by the parties at a pre-trial conference before the Commissioner of this court and it was affirmatively pleaded in the pleadings before the California court.[2] Therefore the California order had no force or effect upon that part of plaintiff's military orders requiring him to report to Travis. The same can be said of the District of Columbia order which merely restrained the military from sending plaintiff out of the country.

It is clear then that neither of the court orders in effect subsequent to plaintiff's July 20, 1970 reporting date interfered with plaintiff's reporting to Travis Air Force Base on July 20, 1970, or excused him from reporting any time thereafter. Plaintiff could have reported to Travis and still have been in compliance with both his military orders and the judicial restraining orders.

■ This case is not dissimilar from the situation presented in Dodge v. United States, 33 Ct.Cl. 28 (1897). Despite subsequent events the court held that the plaintiff was AWOL for the entire period in dispute because he was already AWOL when the subsequent event (incarceration) extended his absence from the military. In the instant case plaintiff was clearly AWOL on July 20, 1970 and the subsequent court orders did not obviate this situation. Plaintiff should have reported as ordered.

Thus, since we have concluded that the court orders did not alter plaintiff's status, he has to be considered as having been AWOL for the entire period until

2. Paragraph 2 of plaintiff's petition for a writ of Habeas Corpus and Complaint for Declaratory and Injunctive Relief filed on July 24, 1970 in the United States District Court for the Eastern District of California reads in pertinent part:
"Petitioner is presently under orders to report to Travis Air Force Base, for

shipment to Indochina. Petitioner's original orders which required that he report to Travis by June 12, 1970, were stayed by the United States District Court, Southern District of New York, but said stay and temporary restraining order is no longer of force and effect."

he received his change of orders on April 7, 1971.

■ Of prime importance to the plaintiff's case before this court is the fact that plaintiff wrote to the Commanding Officer at Travis Air Force Base asking him where he should report due to the pendency of the court orders. Since plaintiff was a doctor, the Commanding Officer referred the letter to the Surgeon General. Six months later, plaintiff wrote a second letter directly to the Surgeon General. The response was, at best, evasive. It reads in pertinent part:

> Your current orders assigning you to Vietnam remain in effect. This office [Office of the Surgeon General] understands that you have obtained a restraining order barring your movement overseas. It is expected that you will comply with your original orders when the restraining order is dissolved. In the event the court reaches a decision which requires an amendment of your current orders, you will be so advised.

Plaintiff contends that this letter reinforces his position that he was not AWOL, but on some special active duty status awaiting orders.

Although this letter from the Surgeon General caused the court some difficulty, it must be viewed as nothing more than an opinion of an individual who was not authorized effectively to change plaintiff's admitted AWOL status. The pertinent regulations are quite clear that only certain individuals are authorized either to change an unauthorized absence to an authorized one, or to excuse an absence as unavoidable. AR 630–10, as amended October 3, 1969, provides in relevant part:

> If an absence is to be reclassified from AWOL to authorized absence, or an unauthorized absence qualifies as an unavoidable absence which may be excused, the following commanders may accomplish such actions:

> \* \* \* \* \* \*

> (3) An absence exceeding 30 days may be reclassified or excused, and erroneous entry thereof may be removed, *by the officer exercising general court-martial jurisdiction over the individual.* (emphasis added)

It appears to be clear from the record of this case that the Surgeon General is not the officer exercising general court-martial jurisdiction over the plaintiff. Thus, if the Surgeon General is not authorized to reclassify plaintiff's AWOL status, then his letter can have no binding effect upon plaintiff's military status.

All things considered, it is beyond the realm of imagination that any military force in the world could function effectively if individual officers or enlisted men could choose, unilaterally, to which posts they will report and to which not. Or which orders they will obey and which not.[3]

Having concluded that plaintiff was absent without leave for the period between July 20, 1970 and April 7, 1971 and having concluded that no authorized individual excused the absence as unavoidable, plaintiff's claim for pay and allowances for this period must be denied pursuant to 37 U.S.C. § 503(a) (1970). Plaintiff, however, is entitled to recover for the periods May 16, 1970 to July 20, 1970, and April 7, 1971 to April 9, 1971. Only during these periods was plaintiff in compliance with his orders.

## CONCLUSION OF LAW

Upon the foregoing opinion which includes therein the court's findings of fact, which opinion and findings are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover for the periods May 16, 1970 to July 20, 1970,

---

3. It's hard to visualize, in the military, a soldier AWOL from his assigned post of duty, refusing to comply with official orders, but writing a letter to his commanding officer asking for a more preferred assignment; and then deigning, perhaps, to obey if he is pleased with the answer.

and April 7, 1971 to April 9, 1971, and judgment is entered to that effect. The amount of the recovery will be determined in subsequent proceedings under Rule 131(c).[4]

The court further concludes as a matter of law that the plaintiff is not entitled to recover for the period July 21, 1970 to April 7, 1971, and the petition is hereby dismissed as to the claim for such period.

DAVIS, Judge (dissenting):

For me, the two letters plaintiff wrote to the military authorities and the two answers he received—during the period in which the Defense Department was enjoined from sending him to Vietnam —make all the difference. Early in August 1970 he wrote to the commanding officer of Travis Air Force Base, explaining his situation and requesting instructions as to where he should report for military duty:

\* \* \* I would appreciate being notified whether I should report to any military installation at this point and, if so, by when.

\* \* \* \* \* \*

Plaintiff forwarded a copy of this letter to the Surgeon General.

On August 12, 1970 the headquarters at Travis sent a response to plaintiff which stated in pertinent part:

\* \* \* \* \* \*

\* \* \* You are advised that the Air Force has no operational control over you. This office has contacted Captain Michael Katz of the Litigation Division, Army Office of the Staff Judge Advocate, Pentagon, Washington, D. C., and he advises that he will contact the Surgeon General, and that you will be receiving directions from the Army.

\* \* \* \* \* \*

Plaintiff received no instructions as to where he should report, and on February 4, 1971, wrote to the Surgeon General of the Army. This letter stated:

\* \* \* \* \* \*

As I am directly under the command of the Surgeon General, I am writing your office for advice as to my current status with the military. Based on the fact that I have very little time left in the service, I am unclear as to what to do now. Should I report to Sixth Army Headquarters in San Francisco?

\* \* \* \* \* \*

To this inquiry the plaintiff received the following reply:

\* \* \* \* \* \*

Your current orders assigning you to Vietnam remain in effect. This office understands that you have obtained a restraining order barring your movement overseas. It is expected that you will comply with your original orders when the restraining order is dissolved. In the event the court reaches a decision which requires an amendment of your current orders, you will be so advised.

The only proper understanding of this correspondence, it seems to me, is that plaintiff was officially informed that he should not report to Travis or to Vietnam while the district court's order remained in effect, and that meanwhile the Army had no assignment for him other than to await the end of the litigation. The parties have agreed that throughout the disputed period Switkes remained under the authority and control of the Army and subject to its orders and discipline. He was amenable to orders and to an assignment within the country. There is no suggestion that he hid or could not be found. So far as we know, he did not act inconsistently with his status as an Army captain. Indeed, he tells us—and it is not denied—that he did not feel free to, and did not, engage in other employment. The conclusion I must reach on this record is that he did precisely what the Army told him

---

4. The amount of recovery should be reduced by $350.00 which the plaintiff received in May 1970 as an advance.

to do, and that he was entitled to be paid even though he performed no "service" in the usual sense.

Only a year ago we had before us a military case which seems to me fully comparable. In Bates v. United States, 453 F.2d 1382, 197 Ct.Cl. 35 (1972), an enlisted man was returned from Vietnam to his hometown on temporary leave, with directions to await a permanent change-of-station order. Because of some administrative breakdown, he did not receive such orders, though like Switkes he made appropriate inquiry, and therefore he remained at home for some nine months before his status was regularized. In that instance the service itself corrected its records to show that he was on active duty (not in excess of leave) during the period at home. The issue before this court was whether he could properly retain, in addition to his active duty pay, his civilian earnings during his time at home—and we held that he could under the then existing regulation. For present purposes, the significant point is that the Defense Department itself agreed that Bates was on active duty while he was at home awaiting orders, and this court grounded its judgment on that determination. In view of Switkes' correspondence and what he was told by the Surgeon General, the same position is called for here.

As Judge Nichols points out, it is settled that "actual service" is not a prerequisite to the right to military pay; in circumstances where they were considered on active duty, other servicemen have been granted pay even though they were at home or not performing work for the military. See, e. g., Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961); United States v.

Williamson, 90 U.S. (23 Wall.) 411, 23 L.Ed. 89 (1875); White v. United States, 72 Ct.Cl. 459 (1931); Dickenson v. United States, 163 Ct.Cl. 512 (1963). The true issue is whether the serviceman claiming active duty pay was where the military ordered him to be.[1]

The majority, however, rests upon plaintiff's conceded four-day AWOL from July 20 to July 24, 1970, as tainting the whole rest of the period. I cannot accept this premise because the official correspondence which ensued (beginning in August 1970) shows clearly that he was on active duty, not absent without leave (or absent with leave), while the judicial restraining orders remained in effect. Although he specifically asked where to go, and expressed his willingness to go where ordered, he was told to stay put. See United States v. Williamson, supra.

There is no adequate reason, in my view, to question the authority of the two officers who wrote to Switkes. If plaintiff's post was Travis (as the court holds), the commanding officer of that very Base refused to accept him but referred him to the Army's Surgeon General and told him to wait to receive directions from the Army. Within the Army, the Surgeon General has staff responsibility for the management of health services, exercises technical staff supervision over medical facilities and assets, serves as chief of the Army Medical Department, and "exercises career management authority over commissioned personnel of the Army Medical Department within policies established by the Deputy Chief of Staff for Personnel." AR 10–5, para. 2–36 (change 1, May 1969).[2]

1. In United States v. Williamson, supra, 90 U.S. at 415–416, the Supreme Court drew a sharp distinction between a serviceman on leave and one awaiting orders at home. As to the latter, the Court said: "He is as much under orders, and can no more question the duty of obedience than if ordered to an ambush to lie in wait for the enemy, to march to the

front by a particular direction, or to the rear by a specified time."

2. AR 614–30 (July 1970), Appendix B, provides that inquiries and requests with respect to Army Medical Department officers are to be addressed to the Surgeon General, attention of MEDPT— (appropriate branch). The record shows

As a staff officer, the Surgeon General may not have the technical authority, wholly on his own, to reassign a military doctor, but he certainly has, at the least, the authority to interpret orders which the Office of the Surgeon General undoubtedly drafted, in the first instance, for routine issuance by the Adjutant General. In this case, the Surgeon General was officially interpreting to plaintiff the scope of just such a directive— Switkes' orders to proceed to Travis— and the impact of those orders during the period the judicial restraints were operative. There could hardly be a more authoritative explanation, and I cannot bring myself to reject the voice of the Surgeon General speaking officially to an Army doctor inquiring about his assignment.

The direct effect of the Surgeon General's interpretation of plaintiff's orders was that the latter's omission to go to Travis, after July 24th, was confirmed and sanctioned. The captain was officially told not to proceed to Travis or any other military post; like the airman in Bates v. United States, *supra*, and the captain in United States v. Williamson, *supra*, he was on active duty where he was, awaiting further orders or assignment. Accordingly, Switkes was not absent from his post after July 24th, and I do not think that 37 U.S.C. § 503(a) (1970)—which governs only servicemen absent without leave or over leave—is applicable. There is no need, therefore, to consider whether the Surgeon General had authority to reclassify an otherwise unexcused absence without leave.

These are the reasons why I think that plaintiff should recover for the period from July 25, 1970 to April 7, 1971. I add that—perhaps it should go without saying—our personal views, one way or the other, as to conscientious objection, plaintiff's invocation of that doctrine, and the Vietnam hostilities are wholly irrelevant to the solution of the problem before the court.

NICHOLS, Judge (dissenting):

The court's opinion is able and in some respects persuasive, but analysis discloses some flaws. The case is difficult. Switkes is not going to win any popularity contests, especially among those who were over draft age all these last ten years, but his claim is entitled to objective consideration. Nor is it as brazen as, *e. g.*, that asserted in Borys v. United States, 201 Ct.Cl. —— (decided May 11, 1973). The chutzpah championship we awarded in Weir v. United States, 474 F.2d 617, 200 Ct.Cl. —— (1973), is not in danger of passing to a new holder.

Switkes may have been led to assert, and then give up, and then assert again, his claim to be a conscientious objector, by changes in the legal climate respecting the criteria for conscientious objection. See prevailing, concurring and dissenting opinions in Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

At any rate, we have it on the authority of the United States District Court for the District of Columbia that not only was he a genuine conscientious objector as of 1971, but the contrary conclusion of the Selective Service Board was "without basis in fact," as of 1967. The reader also needs to know that the two previous dismissals of plaintiff's petitions, in California and New York, were on jurisdictional grounds. Those courts never got to the merits. We are legally forced to conclude, by collateral estoppel, and I do conclude, that Switkes' erratic behavior over the years involved was the resultant of an erroneous Board decision working against a genuine conscientious objection to participation in all wars, such as the will of Congress has traditionally respected. A conscientious objection to service in a non-combat capacity, to using the physician's skill to heal the victims of war, may be hard for

that a telegraphic order amending plaintiff's orders (allowing him leave to July

20) states that any reply should be sent to MEDPT-MC [Medical Corps].

some to understand, but let us not judge as to that.

The true issue before us is Switkes' status during the period involved, whether on active military duty, authorized leave, or AWOL. The key to this issue is the correct interpretation of Switkes' orders. The court revives the blunder, originally Commissioner White's, that plaintiff was ordered to go to Travis Air Force Base in California to serve there somehow or other, or just be there maybe. The actual orders are in the record and never mentioned that base. It came into the case via another subordinate directive, telling plaintiff how he was to get to Vietnam. Travis was of no interest except as a way terminal; it is where the MATS planes depart for the Orient. The orders might just as well have told him to go to Seattle Airport and proceed to the Orient via commercial airline, and no doubt would have except that Government air transport was cheaper. In that event, this court would have had Switkes sit around Seattle Airport from July 20, 1970 to April 7, 1971. The court is trying to hoist plaintiff with his or his counsel's ambiguous stipulation, that he was ordered to Travis "for shipment" to Vietnam, but we are not bound by a stipulation when it is contrary to documents of uncontested authenticity, also in the record. Hegeman-Harris & Co. v. United States, 440 F.2d 1009, 194 Ct.Cl. 574 (1971). In life, Switkes' alternatives were to go to Vietnam per his orders, or stay where he was, and I proceed to explore them.

Defendant did not say plaintiff had to go to Vietnam while the restraining orders were in effect or be AWOL. Not only has it not said so in this litigation, but it did not say so during the alleged AWOL period when it had a chance to do so. The real significance of the Surgeon General's letter the court quotes, is not as an official change or waiver of plaintiff's orders but as an interpretation of them, the only contemporaneous one the plaintiff was ever able to obtain. It seems reasonable and in accordance with our decisions that plaintiff should look to the Surgeon General, the man under whom he was to work, for such interpretation, and what he received should have weight with the court, though not binding. Thus in Gresham v. United States, 470 F.2d 542, 200 Ct. Cl. —— (decided December 12, 1972), we attached weight to a contemporaneous interpretation of a Government specification by two inspectors who concededly had no authority to change or waive it. In that case we rejected the notion that the specifications were ambiguous, but held that Gresham could reasonably believe, from the inspectors, and from prolonged apparent Government acquiescence in his own position, that somehow they were suspended. So here. The orders said nothing about what Switkes was to do in case of a restraining order. He asked for an interpretation. He got one, finally. The court calls it evasive, and perhaps it was. It tells Switkes, without ambiguity, that "you will comply with your original orders *when the restraining order is dissolved.*" (Emphasis supplied). It doesn't tell him he has already been AWOL for months and had better surrender to the first MP he sees. I suggest the real difference between Gresham's case and Switkes' is that Gresham was not the object of this court's disapproval.

The court seizes upon the four days that elapsed between the expiration of Switkes' leave and the issuance of the first restraining order, and says he was admittedly AWOL for those four days, and it taints all the days that followed. This is something the court thought up. Defendant never said it. It is understandable the court was not satisfied with the reasons that defendant actually adduced, to defeat the claim, but possibly defendant was embarrassed to use an argument so obviously in conflict with the Surgeon General's letter. The court should be, too.

The judges, in course of discussing this difficult case, also raised a question concerning 37 U.S.C. § 502(b) and 10 U.S.C. § 701. Under the first, no pay

accrues during a period of authorized leave after the statutory leave allowance is used up. By the second, leave accrues at 2½ days per month up to 60 days. It appears Switkes had used up much of his leave accrued up to then, before the period here in dispute began. The pecuniary consequences of holding, in the instant case, that Switkes was on authorized leave during the periods in dispute would not differ much from those that will follow from holding he was AWOL. It appears to me that the Army, if it lacked the intestinal fortitude to ship Switkes to Vietnam, notwithstanding the restraining orders, and had no use for his services in the Continental United States, should have authorized him to take leave. It appears that we might regard that as done which ought to have been done (*cf.* discussion in Anderson v. United States, 201 Ct.Cl. —— (decided May 11, 1973)), for it is inequitable that Switkes should be better off financially than one, otherwise similarly situated, who obtained authority to go on leave. Nevertheless, defendant (doubtless hoping for a useful precedent), rejected this compromise solution, and so *sub silentio,* does the court. I can only suppose that, for some reason unknown to me, this resolution is incorrect. If then, the choice for me is between full pay status for Switkes, and classifying him as a deserter, I have no difficulty.

Switkes, of course, rendered no useful service. However, the court does not deny that military pay results from the soldier's status, not his actual service. Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961); Bates v. United States, 453 F.2d 1382, 197 Ct. Cl. 35 (1972); Dickenson v. United States, 163 Ct.Cl. 512 (1963). Since there is no cleavage between me and the majority, as to this, I need not belabor it further. The reader should know that the most obvious reason for denying this claim is not, legally, a valid one.

I entirely agree that an Army made up in whole or in part of persons behaving as Switkes did, would not survive its first battle. However, I deny that has any relevance to the present lawsuit. Switkes has already crossed his enemy's goal line and won his game. So far as Switkes could wreck the Army, he has already done it. In this court, he is only trying for the extra point after his touchdown, and if he earns it, we should award it to him. Despite the court's apparent belief, there is only money still involved, not national security.

It has always been accepted that a genuine conscientious objector will not be of much value if forced to serve, and it does not help to denounce him. Cases such as this are bound to occur if the three branches of Government fail to establish, maintain and apply, consistent and uniform standards of what is required for a valid claim of conscientious objection. Also, it would help if the Services, confronted as they must be with the likes of Switkes, could avoid being paralyzed by him, as by a cobra's stare, and could at least find a way to answer his questions about his orders with clarity and firmness, not evasion, and with promptness instead of delay. They they might be as successful against domestic Switkeses as they are against foreign enemies.

I hope I will not give offense if I call this case an example of result-oriented jurisprudence, not meaning to impugn the good faith of the majority, or the effort it has expended on the case, obviously great, or its professional capacity. I mean it has allowed its feeling for the equities of the situation, feelings partly valid, partly mistaken, to influence unconsciously its resolution of a purely legal problem, the interpretation of Switkes' orders, and lead it to a conclusion that it would regard as untenable under other circumstances. This we all do at times, I myself as often as anybody, I am sure. But I try not to.

I would award plaintiff pay for the period July 21, 1970, to April 9, 1971, with allowances and subject to whatever reduction for advances may be appropriate, on the basis of his having been on active duty, not on leave or AWOL, during that period.