**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Dror SAR–AVI, Defendant–Appellant.**

No. 00–10077.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 18, 2001.

Filed July 5, 2001.

Brian Glicker, Encino, California, for the appellant.

Brian L. Sullivan, Assistant United States Attorney, Reno, Nevada, for the appellee.

Before: O'SCANNLAIN, TASHIMA and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

Dror Sar–Avi appeals from the district court's denial of his Motion to Remit Bond Forfeiture pursuant to Rule 46(e)(4) of the Federal Rules of Criminal Procedure. We affirm the district court's summary denial.

I

It is fortuitous that "Yiddish is quickly supplanting Latin as the spice in American legal argot;"[1] otherwise we might be bereft of a satisfactory description of defendant's argument in this case. Fortunately, "chutzpah" is available, because our use of it is quite inevitable. But that is getting ahead of our story.

The whole magillah began in 1986, when Sar–Avi apparently took the wrong message from Einstein's advice that "you cannot beat a roulette table unless you steal money from it." In order to secure gambling credit from Las Vegas, Tahoe and Atlantic City casinos, Sar–Avi temporarily opened several bank accounts under assumed names to create the illusion of financial solvency. He then took full advantage of what Nick "the Greek" Dandalos described as the opportunity the house provides players to beat themselves. In short, Sar–Avi did not meet with success at the tables, proving the old adage: "Depend on the rabbit's foot if you will, but remember that it didn't work for the rabbit."

Having lost his borrowed chips, Sar–Avi withdrew his money from the fraudulent bank accounts, causing over $58,000 in markers sent by Caesar's Palace and Bally's to be returned by the banks for insufficient funds. Perhaps rightly perceiving that the casinos would not take kindly to his charade, Sar–Avi took the money and ran to Israel, making full use of his dual American–Israeli citizenship.

Sar–Avi remained abroad for several years, but was eventually compelled by court order to return to the United States so that he could be deposed in a civil lawsuit he had previously filed against an insurance company. He was greeted with a federal grand jury indictment charging him with four counts of wire fraud, in violation of 18 U.S.C. § 1343.

The government urged that Sar–Avi be detained without bond pending trial because of his prior peripatetic propensities and a tendency to be less than forthright about the necessity for his travel. As an example, the government cited civil pleadings in which Sar–Avi had alleged, among other apocrypha, that he could not leave Israel because of his quite healthy mother's supposedly terminal illness. Despite Sar–Avi's contrary testimony and his repeated sworn assurances that he would remain in the United States for trial, the magistrate judge ordered Sar–Avi detained without bond.

Sar–Avi moved for reconsideration. After hearing testimony of witnesses who agreed to house Sar–Avi, the magistrate judge relented and released Sar–Avi on a $100,000 bond, of which $10,000 in cash was deposited with the court, with Sar–Avi himself as surety. Sar–Avi then pled guilty to wire fraud.

Rather than appear for sentencing as promised, Sar–Avi elected to flee again to Israel. The district court subsequently granted the government's motion to forfeit Sar–Avi's bond, which left the government with $10,000 in hand and a $90,000 marker.

Although out of sight, Sar–Avi was not out of the government's mind. After six years of negotiations and other attempts by the United States to secure his pres-

---

1. A. Kozinski & E. Volokh, *Lawsuit, Shmaw-* *suit*, 103 Yale L.J. 463, 463 (1993)

ence in a federal courtroom, Sar–Avi agreed to return from Israel and submit to United States jurisdiction. He was taken into custody in late 1998. Subsequently, Sar–Avi signed a new plea agreement that dealt with both the original wire-fraud charge as well as the charge of failure to appear. This plea agreement stipulated, *inter alia,* that Sar–Avi would pay the remaining $90,000 owing due to his bond forfeiture at or before his sentencing hearing. The district court accepted the terms of the plea agreement, and at the sentencing hearing, Sar–Avi paid the $90,000 remaining on his bond.

In the guilty plea, Sar–Avi waived his right to appeal "any ... aspect of his conviction or sentence." During the plea colloquy, Sar–Avi confirmed his agreement to waive appeal. Despite these attestations, a year later Sar–Avi moved the district court to remit his bond forfeiture, a request that court summarily denied. Sar–Avi appeals, contending that the district court abused its discretion by declining to give him back the money he agreed to forfeit.

## II

■ After negotiating two plea agreements with Sar–Avi and pursuing him for a decade, the government naturally thinks that the idea that Sar–Avi has preserved any rights to challenge his bond forfeiture is pure mishegas. For his part, Sar–Avi concedes that he forfeited the bond when he fled the United States; that he unconditionally agreed to pay immediately the forfeited amount as part of his plea bargain; and that he agreed to waive his right to appeal the criminal judgment. He simply argues that he never promised not to ask the district court for the money back.

Chutzpuh is not an infrequent visitor in court and may, in fact, have its place in the development of the law. Indeed, as one judge observed, "[l]egal chutzpah is not

always undesirable, and without it our system of jurisprudence would suffer." *Chaffee v. Kraft Gen. Foods, Inc.,* 886 F.Supp. 1164, 1167–68 (D.N.J.1995). Although that enthusiasm may not be shared by all, it is fair to say that the unusual and novel nature of most legal chutzpah often defies existing precedent, forcing sometimes uncomfortable consideration of new questions. That brings us to the issue at hand.

In this case, we are confronted with the question of whether the government should be held to the literal words of its plea agreement because, although the government certainly would wish it otherwise, a careful reading of the plea agreement supports Sar–Avi's position. It provides, in relevant part:

> In exchange for the concessions made by the United States in the instant plea agreement, the defendant knowingly and expressly waives his right to appeal any sentence to be imposed that is within the applicable Sentencing Guidelines range, further waives his right to appeal the manner in which that sentence was determined on the grounds set forth in § 3741, and further waives his right to appeal *any other aspect of his conviction or sentence.* The defendant reserves only the right to appeal any sentence imposed to the extent, but only to the extent, that the sentence is an upward departure and outside the range established by the applicable Sentencing Guidelines.

(emphasis added).

■ "Plea bargains are contractual in nature and subject to contract-law standards." *United States v. Sandoval–Lopez,* 122 F.3d 797, 800 (9th Cir.1997). "[I]n interpreting plea agreements, the government is to be held to the literal terms of the agreement ... and ordinarily must bear responsibility for any lack of clarity." *United States v. Phillips,* 174 F.3d 1074,

1075 (9th Cir.1999). Thus, we have held that a promise not to challenge convictions or sentences did not prevent a defendant from collaterally attacking his conviction by filing a motion pursuant to 28 U.S.C. § 2255 because such an action was not forbidden by the plea agreement. *Sandoval–Lopez,* 122 F.3d at 800–01. In reaching a similar conclusion in *United States v. Pruitt,* 32 F.3d 431, 433 (9th Cir.1994), we noted that "[t]he government gets what it bargains for but nothing more."

■ Under the literal terms of the agreement, Sar–Avi is correct: he did not agree that he would not seek remittance, nor did he agree to waive his right of appeal from a denial of his remittance request. Contrary to the government's assertion, a Rule 46(e) motion to remit is a civil motion, not a criminal appeal. *United States v. Vaccaro,* 51 F.3d 189, 191 (9th Cir.1995) ("Enforcement of a bond forfeiture, although arising from a prior criminal proceeding, is nevertheless a civil action.").

Further, a Rule 46(e) motion is not a challenge to an "aspect of his conviction or sentence." Sar–Avi's duty to pay the bond forfeiture amount dated to September 21, 1992, when the district court issued a default judgment against him after he absconded for Israel. The subsequent plea agreement did not alter his legal obligation to pay the money; it merely ensured that he would pay it *immediately,* thereby theoretically relieving the government of later efforts to recover the judgment.

In sum, although the government could have asked Sar–Avi to waive his right to file a Rule 46(e) motion in his plea agreement, it did not. Sar–Avi complied with every aspect of his sentence, and does not challenge that sentence or his underlying conviction. His civil motion to remit is not an appeal. Thus, nothing in the plea agreement precluded Sar–Avi from making a Rule 46(e) motion to the district court, nor from appealing the district court's denial of that civil motion.

### III

■ Although chutzpah may occasionally play a salutary role in provoking the creation of legal precedent, it rarely meets with a successful result. Indeed, when the term "chutzpah" is used in judicial opinions, it is almost always synonymous with the losing party. And so it is here. Even though Sar–Avi did not waive his right to move for remittance under Rule 46(e), the district court did not abuse its discretion in denying the motion.

■ Federal Rule of Criminal Procedure 46(e)(1) requires bail forfeiture when a defendant breaches a condition of his bail. However, courts may set all or part of the forfeiture amount aside if "justice does not require the enforcement of the forfeiture." Fed.R.Crim.P. 46(e)(2) and (e)(4). A court may rely on several factors in ruling on a motion to remit under Rule 46(e)(4), including:

> 1) the willfulness of defendant's breach; 2) the participation of the sureties in apprehending the defendant; 3) the cost, inconvenience and prejudice suffered by the government as a result of the breach; and 4) any explanation or mitigating factors presented by the defendant.

*United States v. Castaldo,* 667 F.2d 20, 21 (9th Cir.1981). These are merely non-exclusive factors for consideration, and "[n]ot all of the factors need to be resolved in the government's favor." *United States v. Amwest Surety Ins. Co.,* 54 F.3d 601, 603 (9th Cir.1995).

Applying the relevant factors to Sar–Avi's case, there is no evidence in the record to support an abuse of discretion. First, Sar–Avi willfully breached the conditions of his bond. The court required,

*inter alia,* that Sar–Avi surrender his passport and obtain no further passport; and that he refrain from traveling outside of the Central District of California except for trips to and from Reno, Nevada, for trial-related purposes. In direct contravention of this order, Sar–Avi obtained a passport-equivalent and left for Israel.

In response, Sar–Avi claims that his departure was not "willful" because he had a "near fatal" heart attack after the entry of his plea and could neither receive nor afford proper medical care in the United States. Thus, he alleges that he had no choice but to flee to Israel to obtain medical treatment for his life-threatening affliction. On its face, that contention might startle the many fine cardiologists in the greater Los Angeles area, where his first plea was entered. It would also doubtless surprise the physician who actually treated Sar–Avi in the United States—without apparent regard to his financial means—and who concluded that Sar–Avi had suffered stress-related chest pain, but not a heart attack. Indeed, there is no proof that Sar–Avi was ever refused health care in America for financial or any other reason.

██ Even if Sar–Avi had a colorable factual argument, physical danger does not automatically justify setting aside a forfeiture. *See United States v. Abernathy,* 757 F.2d 1012, 1016 (9th Cir.1985) (district court had discretion to deny remission of bond forfeiture where defendants allegedly failed to appear because they feared for their lives if they were eventually returned to the District of Florida).

Sar–Avi's reliance on the Tenth Circuit's decision in *Smaldone v. United States,* 211 F.2d 161 (10th Cir.1954) is unavailing. In *Smaldone,* the defendant's appendix was removed on the opening day of his trial; the defendant was examined by a doctor appointed by the district court, and then went directly from the courtroom to the hospital. *Id.* at 165. The trial resumed

within days of the appendectomy. In sharp contrast, Sar–Avi skipped the country without notifying the district court or the government, and only initiated contact with the United States three years after absconding for Israel. Sar–Avi has failed to present any proof of a life-threatening medical emergency, nor any evidence that he could not receive care in the United States. He did not met his burden to prove that his departure and prolonged absence did not constitute a willful breach of his bond terms.

██ The third factor-cost and inconvenience to the government-also weighs against Sar–Avi. The government is not required to prove the actual cost of defendant's breach: the bond amount is a form of liquidated damages in the event of a breach. *Amwest Surety Ins. Co.,* 54 F.3d at 604. In any case, the government can easily show both cost and inconvenience. As a result of Sar–Avi's escape to Israel, resolution of the case against him (and any restitution to the victims of his fraud) was delayed by over seven years. The government explored extradition with Israel, but was informed that Israel does not extradite Israeli citizens. The government initiated proceedings for sentencing *in absentia* and communicated with Israeli officials about the possibility of Israel enforcing the American sentence. For many years, the government was forced to respond to Sar–Avi's intermittent attempts to negotiate a return from Israel on favorable terms.

As a final consideration, the government was induced to enter the plea bargain in large part by Sar–Avi's promise to pay immediately the remaining $90,000 of the bond forfeiture amount. Although Sar–Avi's waiver of appeal does not include waiver of his rights under Rule 46(e), the existence of the plea bargain is properly weighed as a factor-a significant factor-in analyzing whether remittance is in the in-

terest of justice. Sar–Avi should not be able to benefit from paying his bond (by receiving a lesser jail sentence, for example) and then receive equitable relief from the payment once he is out of danger.

In sum, Sar–Avi did not waive his right to make a Rule 46 motion to remit, but the district court properly denied the motion. A defendant who jumps bail, flees the country, and obtains a favorable plea bargain based on his promise of immediate payment should not, as a matter of law, expect a refund for the asking. Forfeited bonds do not contain money-back guarantees. Having observed the defendant twice fly the coop to avoid paying his just debts, the district court did not abuse its discretion in declining to return the forfeited funds.

## IV

To date our court has only engaged in "[t]alk about chutzpah." *United States v. Ramirez–Cortez*, 213 F.3d 1149, 1159 (9th Cir.2000) (Silverman, J., dissenting). We have not, as yet, adopted a "chutzpah doctrine," as the D.C. Circuit has, *see, e.g., Caribbean Shippers Assoc., Inc. v. Surface Transp. Bd.*, 145 F.3d 1362, 1365 n. 3 (D.C.Cir.1998); nor joined the Federal Circuit in giving "chutzpah awards," *see, e.g. Dainippon Screen Manf. Co., Ltd. v. CFMT, Inc.*, 142 F.3d 1266, 1271 (Fed.Cir. 1998); nor conducted a "chutzpah championship," as does the Court of Federal Claims, *see, e.g., Switkes v. United States*, 202 Ct.Cl. 162, 480 F.2d 844, 851 (1973) (Nichols, J., dissenting). All we can say in our nascent consideration of chutzpah jurisprudence is that the wise judgment of the district court is

**AFFIRMED.**