[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13172

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

AKRUM ALRAHIB,

Defendant,

LEXINGTON NATIONAL INSURANCE CORPORATION,
GEORGE ANTAR,
MARTIN KERRINS,

Interested Parties-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cr-20165-RS-1

_____

Before NEWSOM, ABUDU, and MARCUS, Circuit Judges.

PER CURIAM:

This appeal was taken from the district court's denial of bond remission to three appellants, Lexington National Insurance Corp., George Antar, and Martin Kerrins (the "Sureties"). On appeal, the Sureties claim that the district court abused its discretion when it improperly denied them remission of their bonds because its decision did not serve the interests of justice. After careful review, we affirm.

**I.**

The relevant background is this. Starting around April 2013, Akrum Alrahib imported and sold various tobacco products and marijuana paraphernalia to U.S. customers. Federal law required Alrahib to pay federal tobacco excise taxes on imported large cigars. But he developed a scheme through which he avoided paying the true amount of the mandatory excise taxes he owed. In the scheme, Alrahib concealed the price he actually paid for each cigar

by creating false invoices, which showed a lower price per cigar, and in turn triggered lower excise taxes. In early 2019, a federal grand jury sitting in the United States District Court for the Southern District of Florida indicted Alrahib on thirty counts, including charges of conspiracy to commit an offense against the United States by fraudulently refusing to pay or evading federal tobacco excise tax (18 U.S.C. § 371 and 26 U.S.C. § 5762(a)(3)) (Count 1); conspiracy to commit wire fraud (18 U.S.C. § 1349) (Count 2); wire fraud (18 U.S.C. § 1343) (Counts 3–4); and fraudulent refusal to pay or evasion of federal tobacco excise tax (26 U.S.C. § 5762(a)(3)) (Counts 5–30). The indictment also sought over $9.9 million in forfeiture.

At Alrahib's initial appearance, the Government claimed Alrahib was a flight risk and sought pretrial detention. The magistrate judge disagreed, and, ultimately, the district court adopted the magistrate judge's Report and Recommendation ("R&R") and granted pretrial release to Alrahib. In so doing, the court entered a $1 million corporate surety bond, secured by Lexington National Insurance Corporation ("Lexington"), George Antar, and Martin Kerrins, and a $1.5 million personal surety bond, secured by the latter two co-signatories. The appearance bond provisions also (1) established the conditions of Alrahib's home confinement, (2) proscribed Alrahib from "work[ing] in any business involving the sale or importation of tobacco products," and (3) observed that Alrahib, as a condition of his release, "[s]hall not commit any act in violation of state or federal laws." Upon the Sureties' agreement, Alrahib

was released and placed on house arrest at a friend's home in Coral Gables, Florida.

Once out on house arrest, however, Alrahib violated key conditions of his pretrial release.  For one thing, he attempted to bribe a key witness with the payment of $200,000 per year to leave the country and hide in Mexico so that the witness -- who was listed as the sole officer and registered agent of Alrahib's tobacco business -- would avoid his scheduled grand jury testimony.  Alrahib also attempted to continue his tobacco business by instructing this employee on its day-to-day management, in violation of the condition forbidding Alrahib from working in the tobacco industry.  In addition, Alrahib failed to comply with certain provisions of his house arrest, including failing to satisfy permitted reasons for leaving the residence.

Upon learning that the bond conditions had been violated, the Government moved to revoke and estreat Alrahib's bonds and obtained a second, 12-count indictment against Alrahib, alleging witness tampering and obstruction of justice.  The second indictment also charged ten new counts of refusal to pay federal tobacco excise taxes, along with seeking an additional $1.95 million in forfeiture.  Alrahib's release was revoked, and the district court ordered forfeiture of the $2.5 million in bonds.

Thereafter, Alrahib entered into a plea agreement in the original criminal case.  He agreed to plead guilty to Count 1 of the first indictment, which charged him with conspiracy to defraud the United States by fraudulently refusing to pay or evading federal

tobacco excise tax, in violation of 18 U.S.C. § 371 and 26 U.S.C. § 5762(a)(3), and he acknowledged that the Government would seek over $7.2 million in restitution.  In exchange, the Government dismissed Counts 2–30 of the initial indictment and the second indictment in full.

Alrahib subsequently was sentenced to 60 months in prison, to be followed by 3 years of supervised release, and ordered to pay about $7.2 million in restitution.  Separately, in yet another criminal action brought against Alrahib for tax evasion -- this time in the United States District Court for the Eastern District of California -- the Government also charged Alrahib with conspiracy to commit mail fraud.  Alrahib pleaded guilty in that case too and was sentenced to 60 months' imprisonment to run concurrently with his sentence in the Southern District of Florida, and was ordered to pay over $10 million in restitution.  *See United States v. Alrahib*, Case No. 21-cr-185 (E.D. Cal.).

Lexington then sought remission from the district court in the instant case, under Fed. R. Crim. P. 46(f)(2)(B), of its $1 million corporate surety bond, claiming that it was not responsible for Alrahib's violations and, in any event, Alrahib had not "abscond[ed]." Kerrins sought the same relief as to his $1.5 million bond obligation (co-signed by Antar), arguing that, because he had no knowledge or involvement in Alrahib's bond violations, the interests of justice required setting aside Kerrins' bond forfeiture because Kerrins "has done nothing wrong here."  Antar, too, claimed that the interests of justice did not require bail forfeiture.  He said that Alrahib's

conduct was without Antar's knowledge or participation, that Alrahib never missed any court appearances as a result of his violations, and that the Government had not lost money or suffered any inconvenience in taking custody of Alrahib because Alrahib was never a fugitive. In response, the Government claimed that it had incurred significant expense investigating Alrahib's conduct, which led to a second indictment; that the Sureties were well aware of the risks involved in signing the bonds; and that Antar and Kerrins profited from Alrahib's fraudulent conduct.

In support of its claim that the co-signatories profited from Alrahib's conduct, the Government filed a notice and provided evidence of payments from Alrahib to Antar and Kerrins concerning the corporate bond entered by the co-signatories. These payments reflected a series of wire transfers seemingly to the co-signatories, including a transfer of $180,000 to Kerrins in March 2019, and a transfer of $1.25 million to the "John Antar Trust," among others. In response, the Sureties said that these payments reflected legitimate business transactions or were unrelated to their participation as a co-signatory to the bond for Alrahib.[1]

Following the resolution of Alrahib's criminal cases, the magistrate judge conducted an evidentiary hearing to address the

---

[1] Antar claimed that the payments he had received from Alrahib were legitimate business transactions – thus, for example, that the $1.25 million wire transfer actually returned funds to a trust account following Antar's investment into Alrahib's company and a subsequent demand for a refund. Likewise, Kerrins claimed that the $180,000 payment he received was unrelated to his participation as a co-signatory to the bond for Alrahib.

forfeiture action and whether any portion of the bond should be remitted or set aside. In an R&R, the magistrate judge recommended that no portion of the bond be remitted, and over the Sureties' objections, the district court adopted the order.

Lexington, Antar, and Kerrins timely appealed.

## II.

An appearance bond is "a contract between the government on one hand and a principal and his surety on the other." *United States v. Miller*, 539 F.2d 445, 447 (5th Cir. 1976).[2] Federal Rule of Criminal Procedure 46 governs the setting and revocation of bonds. Under Rule 46, a court *must* declare a bond forfeited if any conditions are breached. Fed. R. Crim. P. 46(f)(1). Nevertheless, a court *may* set aside all or a portion of a bond forfeiture if: (A) the surety to the bond later surrenders the person released on the surety's appearance bond; or (B) justice does not require forfeiture. *Id*. 46(f)(2). District courts have "virtually unbridled discretion" to remit bond forfeiture. *United States v. Diaz*, 811 F.2d 1412, 1415 (11th Cir. 1987).

Thus, we review a district court's decision to remit forfeiture of a bond for "arbitrary and capricious abuse of discretion." *Id*. We may not substitute our discretion for that of the district court.

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), we adopted as binding precedent all Fifth Circuit decisions issued before October 1, 1981.

*Id.* "A district court . . . abuses its discretion when it makes an error of law." *United States v. B.G.G.*, 53 F.4th 1353, 1360 (11th Cir. 2022).

In order to establish that "justice necessitates remission" of a bond under Rule 46(f)(2)(B), the party seeking remission generally must establish that the forfeiture "bears no reasonable relation" to:

> 1) the cost and inconvenience to the government in regaining custody of the defendant,
>
> 2) the amount of delay caused by the defendant's default and the stage of the proceedings at the time of his disappearance,
>
> 3) the willfulness of the defendant's breach of conditions and the prejudice suffered by the government, and
>
> 4) the public interest and necessity of effectuating the appearance of the defendant.

*Diaz*, 811 F.2d at 1415; *see also United States v. Parr*, 594 F.2d 440, 444 (5th Cir. 1979). Although these four factors -- "the *Diaz* factors" -- are not the only factors that may be relevant, this Court has made it clear that the movant's "financial plight" is not a valid consideration. *Diaz*, 811 F.2d at 1415 n.2, 1416.

Here, the Sureties argue that the interests of justice require remission of the $2.5 million bond amount, and that the district court improperly denied remission of all or part of the two bonds. We are not convinced.

To begin with, the district court correctly considered the *Diaz* factors. Starting with the "willfulness" of Alrahib's conduct, it is significant that Alrahib tried to bribe an employee to leave the country to frustrate his prosecution, violated his location monitoring condition, and continued to operate his tobacco business while on house arrest. As we've explained, the "degree of blatancy or extenuating circumstances in [a] defendant's bond violation are necessary considerations" when assessing "discretionary remission." *Parr*, 594 F.2d at 442. Alrahib's violations were "blatant" and plainly designed to undermine the Government's prosecution efforts, and, as the district court found, Alrahib's "egregious federal criminal conduct [has] frustrate[d] the justice system."

The Sureties try to brush aside Alrahib's "blatant" conduct by emphasizing that Alrahib himself never fled. It is true that Alrahib did not attempt to flee. But the Sureties were on notice that the bonds contained several important conditions beyond merely prohibiting Alrahib's flight. Indeed, Antar and Kerrins were even present at the bond-setting hearing where the conditions were discussed. Moreover, as the district court suggested: "[T]his federal crime of witness tampering defeats the purpose of satisfying his mere appearance. . . . . A defendant should not be permitted to substantially violate the terms of his bond without penalties and sanctions."

As for Lexington's claim that "willfulness" can only be considered under *Diaz* when a defendant fails to appear, this argument lacks support in the case law. As we've noted, a district court is

empowered with "virtually unbridled discretion" to determine whether a bond violation was inadvertent or willful, and there is nothing to suggest that the district court could not consider Alrahib's willfulness in this instance.

Nor did the district court improperly weigh the cost and inconvenience to the Government caused by Alrahib's violations. *See Diaz*, 811 F.2d at 1415. The district court docket sheet reflects that the court conducted no fewer than six court hearings about Alrahib's bond violations, and the Government was thereafter required to bring a second indictment following Alrahib's witness tampering, which resulted in even more hearings and briefs. On this record, there is ample evidence to support the finding that Alrahib's bond violations triggered additional time, inconvenience, and cost to the Government. And while the Sureties argue that the cost or inconvenience cannot be assessed because the Government did not submit precise monetary or temporal calculations, we've said that the district court need not find a precise cost. *See, e.g.*, *Parr*, 594 F.2d at 442 (noting that "[w]e cannot fault the district court for not requiring a dollar mark" on the expense of apprehending a fugitive, even where "the exact dollar expense evidence was sparse," because "we know that the search could not have been carried on without the use of government vehicles, long distance telephone communications and the like"); *see also United States v. Cervantes*, 672 F.2d 460, 463 (5th Cir. 1982) (observing that *Parr*'s rationale relied on *United States v. Kirkman*, 426 F.2d 747 (4th Cir. 1970), and that, after *Kirkman*, the Fourth Circuit clarified "that the government has no burden to produce any evidence of its expense

unless and until the district court, *in its discretion*, requires it to do so" (emphasis added)).

As for the fourth *Diaz* factor, the court did not improperly conclude that the public interest cut against remission. *See Diaz*, 811 F.2d at 1415. We recognize that, on one hand, "[t]he purpose of a bail bond is not punitive. Its object is not to enrich the government or punish the defendant." *Parr*, 594 F.2d at 444; *see also United States v. Bass*, 573 F.2d 258, 260 (5th Cir. 1978) ("The purpose of a bail bond is not punitive; it is to secure the presence of the defendant."). But on the other hand, as the magistrate judge observed in the R&R, "setting aside the sureties' obligations on this bond would have future effects on bond commitments in this district because future sureties would not take their obligations seriously."

Moreover, the bond conditions unequivocally provided that the signatory was responsible for payment in full should Alrahib violate "any" condition. The bond itself also expressly noted that Alrahib "[s]hall not commit any act in violation of state or federal laws." Further, each signatory signed under language admitting that "I have carefully read and I understand this entire appearance bond consisting of four pages, . . . and I know that I am obligated by law to comply with all of the terms of the bond." As a result, we have little doubt that the Sureties understood their potential exposure at the time of signing should Alrahib commit further illegal acts or violate the conditions of his bond.

Finally, we are unconvinced by the Sureties' remaining arguments in support of their claim that the district court abused its

broad discretion by failing to grant full or partial remission.  Lexington, for its part, asks us to reject the district court's reliance on the contract principle of "liquidated damages" as supporting bond forfeitures. But other courts consistently characterize surety bonds as contracts, *see Diaz*, 811 F.3d at 141, and when interpreting contracts, we must "give effect to the reasonable intentions of the parties," *Parr*, 594 F.2d at 442 -- which includes any liquidated damages provisions.  Lexington has not persuaded us that we should do otherwise.  As the R&R observed, an appearance bond "is a form of liquidated damages in the event of a breach" because "[t]he government is not required to prove the actual cost of [a] defendant's breach." *United States v. Sar-Avi*, 255 F.3d 1163, 1168 (9th Cir. 2001). "The hallmark of a liquidated damages provision is reasonableness at the time the agreement is made rather than a calculation of actual provable losses when the breach occurs." *United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 604 (9th Cir. 1995).

In this case, under any theory, the bond amount was reasonable -- Alrahib himself proposed a comparable bond portfolio totaling $2 million, and the district court raised the total package only slightly, to a total $2.5 million.  Furthermore, the $2.5 million bond forfeiture amount reflected less than 15% of the total $17.25 million that had been ordered in restitution by that time.

As for the Sureties' claim that the district court improperly refused to consider them individually, the magistrate judge's R&R clearly considered each Sureties' relationship with the defendant and their awareness of bond conditions separately.  Further, to the

extent Kerrins relies on *United States v. Steinger*, 2012 WL 4978843 (S.D. Fla. Oct. 17, 2012), it is neither binding on this Court nor apposite. The court in *Steinger* merely held that a non-surety who had not "sign[ed] onto, and agree[d] to be bound by, all the conditions of Defendant's bond" should be remitted the bond. *Id.* at *1. But here, Kerrins was a signatory, so *Steinger* would not apply. Similarly, we find no basis for Kerrins' argument that the district court erroneously "treated the bond violation as a purely contractual matter rather than considering all relevant factors" under Fed. R. Crim. P. 46(f)(4) (permitting courts to set aside in part or whole the forfeiture amount if "it appears that justice does not require bail forfeiture"). As the record amply reveals, the district court considered the nonexclusive *Diaz* factors, as well as several additional factors.

Lastly, Kerrins' claim that his health and financial hardship required remission is unconvincing. The district court considered Kerrins' poor health and finances among a panoply of other factors before concluding that the Rule 46(f) standard "does not depend on the nature and relative severity of the harm that would be visited upon the surety."

Accordingly, the district court did not abuse its broad discretion in denying the Sureties remission of their bonds, and we affirm.

**AFFIRMED.**